UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| Autumn Court Operating Company LLC, et al.<br><br>Plaintiffs,<br><br>v.<br><br>Healthcare Ventures of Ohio LLC, et al.<br><br>Defendants. | Case No. 2:20-cv-4901<br><br>Judge Marbley<br><br>Magistrate Judge Vascura |

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF AMENDED MOTION FOR PRELIMINARY AND PERMANENT INJUNCTION**

**I.       INTRODUCTION**

In their opposing memorandum, Defendants misrepresent critical facts. And they offer no authority to support their contention that Defendant Healthcare Ventures of Ohio LLC ("HVO") is somehow "prohibited" from providing access to the $1.19 million CARES Funds that are held in HVO's account at First Financial Bank so those Funds can be used by HVO (now controlled by Plaintiffs) for the intended purpose to fight the COVID pandemic.

The facts and the law discussed in Plaintiffs' Amended Motion for Preliminary and Permanent Injunction and this Reply Brief establish that:(1) HVO defaulted under the Sublease; (2) HVO's default triggered HG Property's rights under the Pledge Agreement; (3) HG Property properly exercised its rights under the Pledge Agreement and now owns and controls HVO; and (4) nothing in the CARES Act or HHS' answers to "frequently asked questions" prohibits HVO from accessing and utilizing the CARES Funds. In fact, providing such access is authorized by the Center for Medicare and Medicaid Services as well as the Sublease.

Plaintiffs are entitled to the injunctive relief they seek, including an injunction enjoining Defendants from denying them access to the CARES Funds. Defendants' contentions that

1

Plaintiffs are not likely to succeed on the merits of their claims, that Plaintiffs have not shown irreparable harm but rather seek "money damages," that Defendants would be "harmed" by the injunction, and that the public interest "would not be served" by the injunction find no support under the facts of this case or the law.

## II. CRITICAL FACTS

Defendants attempt to convince the Court that no Event of Default under the Sublease occurred, that HG Property's rights under the Pledge Agreement consequently were not triggered, and that HG Property did not properly exercise its rights under the Pledge Agreement. But that attempt fails because it is contradicted by the facts and the terms of the agreements at issue.

### A. HVO Defaulted Under the Sublease

The Sublease between HVO and HG Property contains default provisions. An Event of Default under the Sublease occurs when, among other things, HVO fails to "observe, perform or comply with a material covenant, condition, or agreement under the Sublease to be performed by [HVO]" and such failure is not cured by HVO within 30 days after HVO receives written notice from HG Property. (*See* First Amended Verified Complaint, Exhibit E, Sublease, Article 8.1.2.)

HVO defaulted under the Sublease in the several ways identified in the Notice of Default HG Property sent to HVO on August 3, 2020. (*Id.*, Exhibit I, Notice of Default.) Significantly, at his deposition, HVO's President, Paul Dauerman, admitted to the occurrence of one Event of Default identified in the Notice of Default—specifically, HVO's failure to surrender and deliver up Personal Property comprising part of the Subleased Property, that is, the transfer of titles of numerous vehicles. (Joint Exhibit 30, Deposition of Paul Dauerman, pp. 237-238.) That Event of Default, which Mr. Dauerman characterizes as an "oversight," was curable when the Notice of Default was served, but was not cured within 30 days after HG Property provided the Notice of

2

Default to HVO. (Other Events of Default have occurred as well; this is the Event of Default that has been admitted to by Mr. Dauerman.)

Despite Mr. Dauerman's significant admission that at least one Event of Default occurred and was not cured, notwithstanding the Notice of Default, Defendants nevertheless contend in their opposing memorandum that no defaults occurred. For example, Defendants dispute an Event of Default occurred through HVO's failure to provide HG Property with various records and documents. In this regard, Defendants state—without any citation to Brian Hazelbaker's deposition testimony—that he "was forced to concede there are only a handful of records missing." (Opposing Memorandum, p. 13.) Mr. Hazelbaker did not so testify. Rather, he testified that he did not know the quantity of admission agreements that were missing (Joint Exhibit 27, Deposition of Brian Hazelbaker, p. 203); he did not know the number of HR records that were missing (*Id.*, p. 221); he could not quantify the amount of medical records that were missing, but even one missing medical record "is a serious potential problem" (*Id.*, pp. 207-208, 210-211); HVO failed to return policy and procedure documents, admission agreements, and trade name websites (*Id.*, pp. 201-206); and out of approximately 30 supply contracts for each Facility, HVO delivered only three or four of the supply contracts (*Id.*, pp. 154-157). As such, Defendants' challenge to the Event of Default concerning HVO's failure to return records is contradicted, rather than supported, by Brian Hazelbaker's deposition testimony.

Plaintiffs will introduce evidence at the hearing to establish that other Events of Default identified in the Notice of Default did, indeed, occur. But even the one Event of Default admitted by Mr. Dauerman under oath is sufficient to trigger HG Property's rights under the Pledge Agreement.

3

### B.     HVO's Default under the Sublease Triggered HG Property's Rights under the Pledge Agreement

Pursuant to the Pledge Agreement, Dauerman's two companies, which owned 100% of HVO, granted to HG Property a "first lien on and security interest in" their ownership interests in HVO as collateral for the payment and performance by HVO of its obligations under the Sublease. (First Amended Verified Complaint, Exhibit F, Pledge Agreement, Section 2(a).) The Pledge Agreement states that, upon the occurrence of an Event of Default under the Sublease, HG Property "may have any part or all of the Pledged Ownership Interests and Stock registered in their name or that of a nominee" and "shall have the right to exercise all voting rights as to all or any part of the Pledged Ownership Interests and Stock, all other corporate rights and all . . . other rights, privileges or options pertaining thereto as if it were the absolute owner thereof . . . " (*Id.*, Section 2(c).)

In their opposing memorandum, Defendants argue that HG Property had no rights under the Pledge Agreement because the Pledge Agreement "terminated" when the Sublease terminated on July 1, 2020. That argument finds no support under the Pledge Agreement and, in fact, is contradicted by it.

Specifically, Section 16 of the Pledge Agreement—which Defendants neglect to mention—states the Pledge Agreement "shall create a continuing security interest in the Pledged Ownership Interests and Stock and shall (i) remain in full force and effect until the indefeasible payment and satisfaction in full of all Obligations . . . ."[1] Thus, HG Property's security interest in

---

[1] "Obligations" is defined in Section 1 of the Pledge Agreement as "'Tenant's Obligations,' as defined in the Sublease." The Sublease defines "Tenant's Obligations" as "all payments and performance obligations of Tenant under this Sublease and all other documents relating or pertaining to the transactions contemplated by this Sublease." (Sublease, Article 1.) Such Obligations "shall survive the expiration or termination of the Sublease and… continue in full force and effect until Tenants Obligations have been performed in full" (Sublease Article 23.21).

HVO's pledged ownership interests and its rights under the Pledge Agreement did not "terminate" when the Sublease terminated as Defendants contend. Rather, HG Property's security interest and rights under the Pledge Agreement remained in full force and effect until HVO satisfied all of its Obligations under the Sublease—which never occurred due to its default under the Sublease.

Moreover, even Section 18 of the Pledge Agreement upon which Defendants rely does not support their contention that the Pledge Agreement "terminated" when the Sublease terminated. Section 18 provides that HG Property's rights terminate upon termination of the Sublease, upon payment of the Loan Agreement, **and** upon payment or satisfaction of "all other obligations under the Related Agreements." The term "Related Agreements" as used in the Pledge Agreement means agreements into which HVO has entered with HG Property "effective as the date of" the Pledge Agreement (June 1, 2005). (Pledge Agreement at p. 1, ¶ D.) Thus, the term "Related Agreements" includes the Sublease, which was entered into on June 1, 2005. Consequently, pursuant to Section 18, HG Property's rights under the Pledge Agreement do not terminate until HVO's obligations under the Sublease are satisfied, which never occurred here. Simply stated, Section 18 is consistent with Section 16 of the Pledge Agreement.

In sum, Defendants' contention that the Pledge Agreement "terminated" upon termination of the Sublease is belied by Sections 16 and 18 of the Pledge Agreement. The Pledge Agreement remains in effect, and HVO's default under the Sublease triggered HG Property's rights under the Pledge Agreement.

    **C.    HG Property Properly Exercised Its Rights Under the Pledge Agreement and Now Owns HVO**

As explained in Plaintiffs' Amended Motion, HG Property exercised its rights under the Pledge Agreement after HVO defaulted on its obligations under the Sublease. Specifically, in September 2020 HG Property transferred the pledged HVO ownership interests and exercised the

5

voting rights of the pledged ownership interests to name Plaintiff HVO Operations Windup, LLC ("Windup") as HG property's nominee, to name Windup as the sole member and manager of HVO, and to vest in Windup all rights of ownership of HVO.

In their opposing memorandum, Defendants contend that HG Property's exercise of its rights under the Pledge Agreement constitutes a "null and void seizure of the ownership of [HVO]." (Opposing Memorandum, p. 14.) Defendants premise that contention on the "five-day notice" provision in the "Remedies" section of the Sublease (Article 8.2) that requires HG Property to give five days' notice before exercising its remedies under the Sublease. Defendants assert that HG Property formed Windup and installed Windup as the new manager of HVO "with no prior notice at all." (*Id.*)

Defendants' contention that HG Property conducted a "null and void seizure" of HVO lacks any merit. The five-day notice provision in Article 8.2 of the Sublease applies only where HG Property would pursue remedies **under the Sublease**. Here, HG Property did not pursue remedies under the Sublease—it pursued its rights under the Pledge Agreement. The Pledge Agreement does not contain any provision requiring HG Property to give HVO any "five-day notice" or any notice of the exercise of its rights under the Pledge Agreement. In fact, Section 5(b)[2] of the Pledge Agreement **negates** any notice requirement period. Simply stated, all that the Pledge Agreement requires to trigger HG Property's rights is the occurrence of an Event of Default.

Defendants further contend that HG Property's purported "takeover" of HVO was not based on any "real" defaults but rather was a "fabricated sham" because Plaintiffs "actually began drafting the 'takeover' documents in May 2020 before any notice of default was issued and while [HVO] was still the operator of the Nursing Homes." (Opposing Memorandum, pp. 4, 11.) But

---

[2] This Section specifically states ". . . without notice to or assent by any Pledgor . . ."

6

evidence to be introduced at the hearing will establish that the May 2020 date that appears in one of the documents is a typographical error. More significantly, the evidence will show that HG Property did not exercise its rights under the Pledge Agreement until September 2020 after HVO defaulted under the Sublease and failed to cure its defaults.

In sum, the evidence at the hearing, as well as the plain terms of the Pledge Agreement, establish that: (1) HVO defaulted in its obligations under the Sublease; (2) such default triggered HG Property's rights under the Pledge Agreement; and (3) HG Property properly exercised its rights under the Pledge Agreement and now owns and controls HVO. As next discussed, nothing in the CARES Act or HHS' answers to "frequently asked questions" prohibits HVO from utilizing the CARES Funds, and the utilization of the CARES Funds by HVO is authorized by the Center for Medicare and Medicaid Services as well as the Sublease.

### III. LAW REGARDING THE CARES FUNDS

Defendants contend that HVO is not "permitted" to give Plaintiffs access to the CARES Funds. But Defendants' position finds no support under the law.

#### A. Medicare Permits HVO to Give Plaintiffs Access to the CARES Funds

Plaintiffs' Amended Motion provides the Court with authority from the Center for Medicare and Medicaid Services that permits old and new operators of nursing homes to "work out between themselves any payment arrangement" for the access and use of Medicare-related funds so that operations can continue unimpeded. (*See* CMS Program Integrity Manual, Section 15.7.7.1.5, attached to Amended Motion at Exhibit 1.) In this regard, in a typical transition of Medicare-funded nursing homes between old and new operators, the transfer of the Medicare license takes several months to be fully approved. In the interim, Medicare continues to make payments for services performed pre- and post-transfer dates to the old operator, and Medicare allows the old and new operators to work out any payment arrangements with respect to those

7

payments between themselves. This arrangement is commonly done in the industry through an Operations Transfer Agreement ("OTA") between the old and new operators so that operations may continue unimpeded. Here, the Sublease requires HVO to do that which would be required by an OTA—it grants HG Property a security interest in all accounts; it requires HVO to execute additional documents to maintain and perfect HG Property's security interest; and it requires HVO to "cooperate fully and completely" with HG Property for the "smooth and uninterrupted transition of ongoing operations" and the "uninterrupted continuation of care." (Sublease, Article 22.1, 22.2, 23.23.)

In direct contravention of the foregoing Medicare authority (as well as its obligations under the Sublease), HVO has refused to cooperate in any way in the normal payment arrangement between old and new operators for the access and use of Medicare-related funds, including the CARES Funds. Notably, Defendants' opposing memorandum makes no mention of this Medicare authority, which authorizes HVO to make payment arrangements with Plaintiffs with respect to the CARES Funds. Rather, Defendants ignore this Medicare authority and continue to insist that HVO is not "permitted" to give Plaintiffs access to the CARES Funds. As next discussed, no authority supports their position.

### B. HVO's Reliance on HHS Answers to "Frequently Asked Questions" Is Misplaced

Rather than recognizing the foregoing Medicare authority, Defendants continue to rely on HHS' answers to "frequently asked questions" to support their position that HVO is not "permitted" to give Plaintiffs access to the CARES Funds. But those answers do not apply in this situation where Plaintiffs are not asking HVO to "transfer" CARES Funds to them but rather seek access to the CARES Funds that are held in HVO's bank account so they can be put to their intended use in the COVID pandemic rather than sit idle in the bank.

Defendants rely on this statement in an HHS answer to a "frequently asked question": "[P]revious owners are not permitted to transfer funds to the new owner." (Opposing Memorandum, p. 17.) This statement is not applicable here because HVO is not a "previous owner"; Windup is not a "new owner"; and no "transfer" of funds to a "new owner" would occur. Windup owns HVO by virtue of the acquisition of its membership units under the Pledge Agreement.

Defendants rely on a HHS answer to another question concerning whether a "seller" can transfer CARES funds to the buyer. (*Id.*, p. 18.) That answer states in part that where the transaction "is a purchase of the recipient entity (e.g., a purchase of its stock or membership interests)," the recipient "may continue to use the funds regardless of its new owner." This answer actually supports Plaintiffs' position that, to the extent HVO has any interest in the $1.19 million CARES Funds, HVO is permitted to use the Funds regardless of the fact that HVO's membership units were acquired by Windup. But HVO ignores the foregoing relevant portion of the answer and instead focuses on this irrelevant portion of the answer: "[i]f the transaction is an asset purchase" then "the original recipient must use the funds for its eligible expenses and lost revenues and return any unused funds to HHS." That portion of the answer is inapplicable here because no "asset purchase" has occurred.

Defendants further rely on a HHS answer "no" to a question concerning whether "a provider that purchased a TIN in 2019 [can] accept a Provider Relief Fund payment from a previous owner and complete the attestation for the Terms and Conditions." (*Id.* p. 19.) But that answer is inapplicable here because no "purchase" of a TIN has occurred and HVO is not a "previous owner."

9

Finally, Defendants rely on a HHS answer that states a "parent entity may not transfer a Provider Relief Fund Targeted Distribution payment from the recipient subsidiary to a subsidiary that did not receive the payment." (*Id.*, p. 20.) That answer, too, is not applicable here because no "transfer" from a "recipient subsidiary" to another "subsidiary" exists here.

In sum, try as they might, Defendants' position that HVO is not "permitted" to provide Plaintiffs with access to the CARES Funds finds no support in the HHS answers on which Defendants rely. In fact, nothing in the CARES Act or the HHS answers prohibits HVO from utilizing the CARES Funds in the situation presented here, that is, a situation in which HVO is owned and controlled by Windup by virtue of the Pledge Agreement. The only authority on this issue comes from Medicare, which permits former and new operators of nursing homes to "work out between themselves any payment arrangements" for the access and use of Medicare-related funds. That authority, combined with the provisions of the Sublease requiring HVO to fully cooperate with HG Property for the smooth and uninterrupted transition of ongoing operations, rebuts Defendants' contention that HVO is not "permitted" to give Plaintiffs access to the CARES Funds.

## IV. PLAINTIFFS ARE ENTITLED TO INJUNCTIVE RELIEF

Plaintiffs are entitled to an injunction enjoining Defendants from denying them access to the CARES Funds in HVO's account at First Financial Bank so those Funds can be used for their intended purpose. Each of the elements required for the grant of injunctive relief is present here.

### A. Likelihood of Success on the Merits

As explained in Plaintiffs' Amended Motion and this Reply Brief, the evidence to be presented at the hearing will establish that Plaintiffs are likely to succeed on the merits of the claims they have asserted in their First Amended Verified Complaint. In this regard, Plaintiffs will prove that HVO defaulted on the Sublease, thereby triggering HG Property's rights under the

Pledge Agreement; HG Property properly exercised its rights under the Pledge Agreement; HVO is now owned and controlled by Windup; Windup, as HVO's owner, is entitled to access the CARES Funds held in HVO's bank account; and Windup may use those Funds for their intended purpose at the Facilities.

### B. Irreparable Harm

Plaintiffs have shown a substantial threat of irreparable harm if they are denied access to the CARES Funds. Money damages, awarded many months or years in the future, will not be an adequate remedy because Plaintiffs need to provide extra testing, extra staffing, and additional services now during the pandemic—not at some point in the future.

In their opposing memorandum, Defendants cavalierly contend that "this case is about money." (Opposing Memorandum, p. 23.) But Plaintiffs' request for an injunction isn't about obtaining damages for Plaintiffs—it is about utilizing urgently needed CARES Funds for their intended purpose, that is, to protect over 600 residents and staff from COVID.

Defendants also contend that "Plaintiffs concede they do not need the Funds." (*Id.*) That is a mischaracterization of the deposition testimony provided by Brian Hazelbaker who testified that, while the Facilities have done a good job of dealing with COVID with the funds they currently have or could borrow, the CARES Funds would allow the Facilities to do much more, such as providing additional staffing, purchasing more PPE, providing technology such as iPads so residents could stay connected with family members, providing onsite testing equipment, and providing an extra level of care. (Joint Exhibit 27, Deposition of Brian Hazelbaker, pp. 50-52, 63.) In the midst of a pandemic, having enough money to do the minimum does not mean that additional funds are not needed. Indeed, that's why the Government determined to provide CARES funds to nursing homes—to help them do more to prevent COVID than they could do with their own available resources.

### C. Harm Issue

Defendants argue that injunctive relief should be denied because they "would be harmed by granting relief." (Opposing Memorandum, p. 27.) The harm Defendants articulate is a potential exposure to liability for not returning the CARES Funds to HHS. (*Id.*, p. 28.) That speculative harm pales by comparison to the harm third persons—over six hundred residents of the Facilities and their staff members—face due to the COVID pandemic. And HVO faces no real exposure to liability if, as authorized by the Center for Medicare and Medicaid Services, it enters into a payment arrangement with Plaintiffs for the access and use of Medicare-related funds like the CARES Funds.

### D. Public Interest

Finally, Defendants argue that "the public interest would not be served by issuing a preliminary injunction." (Opposing Memorandum, p. 28.) The public interest Defendants identify is that the relief sought "would disrupt the statutory and regulatory scheme of the CARES Act and HHS guidance." (*Id.*) The injunction sought by Plaintiffs causes no such disruption and is consistent with the CARES Act and HHS' "FAQs." Additionally, the public interest is served when the CARES Funds are utilized by HVO for their intended purpose.

## V. CONCLUSION

For the foregoing reasons, Plaintiffs' Amended Motion for Preliminary and Permanent Injunctive relief should be granted.

Respectfully submitted,

*/s/ Christopher B. Burch*
Gary S. Batke (0030329)
Christopher B. Burch (0087852)
Elizabeth E. Cary (0090241)
BAILEY CAVALIERI LLC
One Columbus
10 West Broad Street, Suite 2100
Franklin County, Ohio 43215-3422
Telephone No. (614) 221-3155
Facsimile No. (614) 221-0479
Email: gbatke@baileycav.com
Email: cburch@baileycav.com
Email: ecary@baileycav.com

*Attorneys for Plaintiffs Autumn Court Operating Company LLC, Brookview Operating Company LLC, Columbus Alzheimers Operating Company LLC, Dublin Convalarium Operating Company LLC, Cridersville Skilled Nursing Facility Operating Company LLC, Gardens At Celina Operating Company LLC, Gardens At Paulding Operating Company LLC, Gardens At St Henry Operating Company LLC, Heatherdowns Operating Company LLC, Mccrea Operating Company LLC, And Oak Grove Manor Operating Company LLC*

Rick L. Brunner (0012998)
Patrick M. Quinn (0081692)
BRUNNER QUINN
35 N 4th St, Ste 200
Columbus, OH 43215
Telephone No. (614) 241-5550
Facsimile No. (614) 241-5551
Email: rlb@brunnerlaw.com
Email: pmq@brunnerlaw.com

*Attorneys for Plaintiffs Ralph Hazelbaker, HG Property Services Corp. and First Ohio Investors I, LLC*

Andrew Gerling (0087605)
Doucet Gerling, Co., L.P.A
655 Metro Place South, Suite 600
Dublin, OH 43017
andrew@doucet.law

*Attorneys for Plaintiffs HVO Windup LLC, and Greggory St. Clair*

## **CERTIFICATE OF SERVICE**

The undersigned certifies that on October 3, 2020, a true and correct copy of the foregoing was served by the Court's CM/ECF system on all parties of record and served via email to:

Quintin Lindsmith, Esq.
qlindsmith@bricker.com

Ali Haque, Esq.
ahaque@bricker.com

*Counsel for Defendants*

                                                 */s/ Christopher B. Burch*
                                                 Christopher B. Burch

Doc No. 1845829v3