**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| Autumn Court Operating Company LLC, et al. | Case No. 2:20-cv-4901 |
| Plaintiffs, | |
| v. | Judge Marbley |
| Healthcare Ventures of Ohio LLC, et al. | Magistrate Judge Vascura |
| Defendants. | |

**PLAINTIFFS' POST HEARING BRIEF**

## I.  Introduction

Plaintiffs have established by clear and convincing evidence all of the factors necessary for the Court to grant a preliminary injunction. Those factors are: (1) a likelihood of success on the merits; (2) risk of irreparable injury if an injunction is not granted; (3) the interests of third parties; (4) the public interest.

To establish a likelihood of success on the merits, Plaintiffs have made three showings.

First, during the transition of operations, HVO defaulted under the Sublease and did not cure its defaults. Three uncured defaults stand out: 1) HVO's failure to meet its "absolute obligation" to "cooperate fully and completely" during the transition; 2) HVO's failure to surrender the Personal Property of the the facilities; and 3) HVO's failure to surrender the Intangible Assets of the facilities. Plaintiffs have additionally shown that each of these defaults had significant negative impact on the facilities.

Second, an uncured Event of Default under the Sublease triggers the right of HG Property to exercise all ownership interests in the pledged membership units including the right to immediate and complete control over all aspects of the business and operations of HVO. The Sublease and Pledge Agreement were negotiated between sophisticated business parties represented by counsel, the terms are unambiguous, and the Sublease and Pledge Agreement

should be construed as written. Under the plain terms of the Pledge Agreement, HVO's default under the Sublease triggered, without notice to or assent by HVO, HG Property's right of ownership in the HVO membership units. HG Property properly exercised its ownership rights under the Pledge Agreement and assigned the HVO membership units to its designee, HVO Operations Windup ("Windup").

Third, acquisition of the HVO membership units allows HG Properties, by and through HVO, to utilize the CARES Funds for their urgent purpose: to prevent COVID-19 in the eleven nursing homes operated by Plaintiffs. This conclusion is consistent with the informal guidance from HHS with respect to the use of funds distributed under the CARES Act, the broad remedial purpose of the CARES Act, and the Medicare program's general guidance under these circumstances. It is further consistent with the terms of the Pledge Agreement under which HVO's default renders Windup the owner of HVO with the right to control all aspects of HVO's business and operations.

In addition to Plaintiffs' showing of their likelihood of success on the merits, Plaintiffs have provided clear and convincing evidence supporting the other factors necessary for a preliminary injunction. Plaintiffs have provided testimony that, while the facilities are doing the best that they can within their budgets, the CARES Funds will be utilized immediately to "do more" to protect the patients in its eleven nursing homes from an unprecedented international pandemic that is presently undergoing a significant resurgence in Ohio.

With respect to the impact on third parties, Plaintiffs have shown that nursing homes are uniquely vulnerable to COVID-19 and that the CARES Funds will be used to control the spread of the disease among Ohio's most vulnerable populations. The requested injunction therefore serves the interests of third parties.

Finally, the evidence supports a finding that the public interest is served by the granting of

an injunction, because the requested injunction clears the way for the emergency CARES Funds to be placed into the hands of a party who can utilize them for their intended purpose.

## II. Background

The background facts are summarized in the Plaintiffs' Amended Motion for Preliminary and Permanent Injunction (Doc. No. 21).

## III. Argument

### A. Standard for a Preliminary Injunction

Plaintiffs have established by clear and convincing evidence the factors necessary for the Court to grant a preliminary injunction: (1) a likelihood of success on the merits; (2) irreparable injury if an injunction is not granted; (3) the interests of third parties; and (4) the public interest.

### B. Likelihood of Success on the Merits

#### 1. HVO Has Defaulted

While the Notice of Default included numerous Events of Default by HVO, Plaintiffs have focused on three of those defaults: (1) HVO's failure to cooperate during the transition by providing "complete and immediate" access to the records and systems of the nursing facilities; (2) HVO's failure to surrender the Personal Property; and (3) HVO's failure to surrender the Intangible Assets. Each of these defaults was not cured within the applicable cure period, and any one of these defaults is sufficient to trigger HG Property's ownership rights to the HVO membership units.

##### a. HVO Has Defaulted by its Failure to Cooperate

Section 23.23 of the Sublease imposes upon HVO an "absolute obligation" to "cooperate fully and completely" with both HG Property, and any new manager, in the "transition of operations" by "providing and allowing complete and immediate access" to "accounting systems and records, contracts, accounts, patient, resident and employee records, and other records and

information necessary for the smooth and uninterrupted transition of ongoing operations at the Facilities and the uninterrupted continuation of care of all residents and patients located at the Facilities." Joseph Hazelbaker testified about the importance of Section 23.23 during a transition of operations:

> A. It is a keystone section that requires the highest standard on behalf of the tenant because of the importance of the transition process, requires absolute obligation to cooperate fully and completely and to complete -- and to provide complete and immediate access to everything used in the operation of the facilities -- facility, excuse me.
> (Hearing Tr. 308:4-9.)

The duty of cooperation imposed under Section 23.23 is owed to both the landlord (HG Property) and to any new operator or manager of the facilities, as Mr. Hazelbaker testified:

> Q. To whom does HVO owe this duty under 23.23?
> A. Well, the duty is owed to the landlord, but also the landlord sublessees or managers, the entities that the landlord chooses for the transition of operations.
> (Hearing Tr. 157:14-17.)

While Mr. Dauerman claimed that HVO cooperated in the transition, his testimony was repeatedly contradicted by himself, his employees, and his former employees. Describing the first couple days of July after the transition, Ms. Seibert, a former employee of Peregrine and the regional nurse consultant for the new manager, described the scene as follows:

> Q. Okay. And so tell me what the first couple days of work were like with your new employer?
> A. Chaotic. A lot of the facilities didn't have access to the shared drive to get their clinical information they needed, their logs related to COVID, incidents and accidents, some labs. They weren't able to access the electronic health record called PCC. So like a nurse goes in to document on July 1; so she wasn't able to get in to access that, nor were they able to access any documentation from prior to July 1. And then, obviously, not able to access the shared drive and the policies and procedures they were used to utilizing.
> (Hearing Tr. 126:12-22.)

Even in the middle of a pandemic, Mr. Dauerman could not be bothered to ensure a smooth transition with respect to sharing or duplicating COVID-related documents. Ms. Seibert testified:

> Q. Okay. Do you recall anything related to COVID-related information?

4

A. Yeah. I mean, we had at that point at least three, maybe four, facilities that had active outbreaks of COVID. And a lot of the facilities -- I mean, we kept all of that information on the shared drive. So they weren't able to access that information to utilize for future reference.
(Hearing Tr. 126:23-127:4.)

When asked about the source of stress related to working at the facilities, Ms. Seibert attributed the stress to both the difficulty of the pandemic itself, and HVO's failure to provide access to important documents and records:

A. Well, within the pandemic with COVID alone, it's stressful enough. And then to have the time to like look for policies and procedures, to try to recreate forms and things that we used before, it's just been very difficult and stressful.
(Hearing Tr. 127:19-23.)

Yet when it comes to whether Mr. Dauerman affirmatively instructed anyone at HVO to actually meet HVO's "absolute obligation" to provide "complete and immediate access" to the information contained on the shared drives, Mr. Dauerman's memory became hazy:

THE COURT: … Mr. Dauerman, did you ever direct your employees to provide[] those drives that Mr. Quinn just identified?

THE WITNESS: I'm not aware -- I've never said anything about the drives or anything, what we were going to provide or not, Your Honor. I know that they were -- our staff would work with their counterparts out there. If there were some proprietary items we could not provide, we tried to work around some things. But I'd have to defer to the CFO and the VP of clinical services. But there were some items – I'm not going to say it was entirely part of these drives that we couldn't do or provide here. I just don't have knowledge of it.
(Hearing Tr. 67:12-67:23.)

In sum, the Sublease at Section 23.23 imposes an absolute obligation on HVO to ensure continued access to all documents and records necessary to ensure a "smooth and interrupted transition of ongoing operations and the uninterrupted continuation of care of all residents and patients located at the Facilities." When faced with that enormous burden, during a pandemic Mr. Dauerman's response was he didn't bother to read the Sublease to understand his critical obligations:

Q. Now, as you were deciding in the -- in the lead up to this July 1 transition, as

5

you were deciding what was going to be left, what was going to be transferred, what
is proprietary, what's not, you never pulled out the sublease and looked at it to see
what it said you had to leave or you had to transition at the end of the term, did
you?
A. That is an accurate statement.
(Hearing Tr. 71:20-72:1.)

Mr. Dauerman's gross negligence and utter failure of any diligence created exactly the kind

of transitional problems that Section 23.23 is designed to prevent.

### b. HVO Has Defaulted by its Failure to Surrender Personal Property

Section 18.2 of the Sublease imposes upon HVO an obligation to "surrender and deliver

up the Subleased Property at the expiration or termination of the Term." The "Subleased Property"

is defined in Section 1.6 to include both the "Personal Property" and the "Intangible Assets" of the

facilities. In turn, the "Personal Property" is defined at Section 1.1.5 of the Sublease as follows:

> All machinery, **vehicles**, equipment, furniture, furnishings, movable walls or
> partitions, computers, trade fixtures, Inventory, and other personal property
> currently located at or in the possession of each Facility and used or useful in the
> operation of each Facility for the number of beds or units for which each such
> Facility is licensed, except items, if any, included within the definition of Fixtures
> or Intangible Assets. (Emphasis added).

Notice of Default under this Section was served upon Mr. Dauerman and a copy was

introduced at the hearing. (JT 15, p. 2.) In response to the Notice of Default, Mr. Dauerman admits

that he had knowledge that the vehicle titles would need to be transferred, admits that it did not

occur, and contends that this error was an oversight. The emails were introduced to Mr. Dauerman

as Plaintiff's Exhibit 4, about which Mr. Dauerman testified:

> Q. And so we go to the fourth page of this exhibit which is an email dated July 21
> or about two weeks later. Mr. Heydon writes to Mr. Patton. He carbon copies
> yourself and says, "Hi, Tim and Paul. Can you comment on how we can allow for
> titles to the owned facility vehicles to be signed over to HG Ohio? I assume they
> are in Peregrine's possession? Also, if you can provide direction on how to allow
> for transfer of Oak Grove lease to HG Ohio, it is appreciated. I'm copying all
> involved in case there are matters to be resolved. Thanks. Larry." Did you respond
> to this email?
> A. I did not.
> Q. To your knowledge, Mr. Patton didn't respond to this email either, right?

6

A. Not that I'm aware of.
(Hearing Tr. 82:2-16.)

Dauerman emphasizes that HVO's failure to provide the vehicle titles was merely an "oversight." He testified:

Q. And you say it was an oversight, but you were on notice -- with emails back in July, you were on notice from the notice of default at the beginning of August, and you had the opportunity to fix the problem, and you waited until after litigation was underway. That's what happened, correct?
A. Well, specifically, the titles are being delivered today. There was nothing intentional whatsoever. Again, in the default, there's no comment about title. So, again, no intention.
(Hearing Tr. 85:1-9.)

But an "oversight," standing alone, is capable of being cured during the 30-day cure period set forth in Sublease Section 8.1.2. After failing to respond to the requests for titles, and instead of curing the default, Dauerman waited until the morning of the preliminary injunction hearing to transfer some but not all of the vehicle titles:

A. The vehicle titles should have arrived at 10:30 this morning.
Q. So, in the midst of this hearing, the titles were delivered to HG Ohio. Is that what you are telling us?
A. That's what I was told. They were being delivered today at 10:30.
(Hearing Tr. 82:20-24.)

Mr. Dauerman would have this Court believe that this issue with vehicles and their titles is much ado about nothing. And Mr. Dauerman's counsel used his opening statement to frame the issue as follows:

In the notice of default, there was an acquisition (sic) that Healthcare Ventures had removed machinery, equipment, and vehicles from the facilities. Now, all the vans and all the buses are supposed to stay at the facilities. There's no question about that.
…
Now, according to Joe Hazelbaker … [t]he issue is they need the titles to some of the vans. That's true. If our client has titles to some of the vans, it should turn that over to them.
(Hearing Tr. 20:18-21.)

Despite Mr. Dauerman's testimony and his counsel's representation to the contrary, and

after the hearing concluded, Plaintiffs became aware that Mr. Dauerman had actually failed to return title *and had taken physical possession* without notice or approval to at least one of the vehicles used by the Autumn Court facility. The facility contacted the police, and a certified copy of the police report from the Ottawa Police Department is attached hereto as Plaintiff's Exhibit 6.[1] In response to the police report of theft, Mr. Dauerman stated that "the van was not stolen, it is in his possession" and that its ownership is part of a "civil matter." Presumably, Mr. Dauerman claims no obligation to surrender the Autumn Court vehicle because it has outstanding bank debt. (See Plaintiffs' Exhibit 4). The Sublease states otherwise. (JT 2 at Section 7.4).

Mr. Dauerman's refusal to promptly surrender the vehicle titles and Autumn Court vehicle without bank debt are instances of HVO's failure to comply with its obligations to surrender all of the Personal Property as set forth in the Sublease. (JT 2 at Section 18.2).

### c. HVO Defaulted by Its Failure to Surrender Intangible Property

In addition to HVO's failure to cooperate and its failure to surrender the Personal Property, HVO defaulted by its failure to surrender and deliver up three important categories of intangible assets when it ceased operations on July 1:(1) the policies and procedures used prior to July 1; (2) all of the data and documents on the "Shared Drive" used in connection with day to day operation of the facilities; and (3) the data and documents on the PointClickCare or "PCC" system pertaining to patients discharged prior to July 1, 2020.

In fact, the testimony shows that not only did HVO fail to "surrender" and "deliver up" these intangible assets, HVO actually *went out of its way* to deprive the facilities of their access to these important resources. Because that conduct constitutes an Event of Default under the Sublease and the default was not cured, the Pledge Agreement allows for HG Property to exercise all rights

---

[1] Exhibit 6 is self-authenticating under Evid.R. 902(2). The officer's statements to law enforcement are factual findings from a legally authorized investigation and are admissible under Evid.R. 803(8), and the statements by Dauerman were made by a party opponent. Evid.R. 801(d)(2).

of ownership in the HVO membership units.

Section 18.2 of the Sublease requires HVO to surrender the Subleased Property, and Section 1.6 defines that to include both the "Personal Property" and the "Intangible Assets" of the facilities. In turn, Section 1.1.6 defines the "Intangible Assets" as follows (emphasis added):

> **Any and all intangible assets used in connection with the operation of each of the Facilities**, including but not limited to **policies and procedures**, admissions agreements, trade names, medical records, resident records, employee records, and **other documents and records used in normal day-to-day business operations**; provided, however, that Tenant shall be obligated for ongoing costs, maintenance or licensing fees, if any, associated with any such intangible assets from and after the Commencement Date (collectively, "Intangible Assets")

### i. Policies and Procedures.

Dauerman admits that he "didn't look at the Sublease" and instructed his personnel to visit the facilities and to gather up the manuals, including the policies and procedures, and remove them from the facilities. (Hearing Tr. 91: 1-10.) Dauerman acknowledged that this is a "big issue" but that a representative of the new manager, Wesley Rogers, said the new manager didn't need the old policies. (Hearing Tr. 91:10-92:22.)

But the Sublease imposes an obligation to "surrender" and "deliver up" "any and all intangible assets used in connection with the operation of each of the Facilities," and it is beyond dispute that HVO did not do that. Dauerman even admitted that he would have refused to provide the policies and procedures, even if the new manager demanded them:

> Q. And you were going to take those policies and procedures regardless of what Mr. Rogers told you because you considered them to be proprietary in nature, correct?
> A. That's correct.
> (Hearing Tr. 98:7-10.)

Moreover, there can be no doubt concerning the importance of returning these policies and procedures because surveys at the facilities rely upon historical data. Ms. Seibert testified about the importance of having both the *current and prior* procedures at the facilities to be referenced in

9

the event of an audit:

> The policies and procedures that we used prior to with Peregrine Health Services, we didn't have access to those policies and procedures for when the Ohio Department of Health came in for infection control surveys and wanted to know, like, how we were doing things related to the COVID pandemic.
> (Hearing Tr. 136:22-137:2.)

Likewise, Joseph Hazelbaker testified that maintaining possession of the policies and procedures utilized by the facilities prior to July 1, 2020 were critical; especially since there had been 49 COVID-19 related deaths:

> Q. Do the facilities need the old policies and procedures?
> A. The facilities would need the old policies and procedures. Like I said, this is only part of the solution. The other part of the solution is to obtain all of the old policies and procedures so that if there is an incident such as a COVID death, everything that was in place in guiding resident care at the time of that incident is available to the regulators or investigators.
> (Hearing Tr. 312:12-19).

The response from HVO was, in the words of Paul Dauerman, that HVO "certainly cooperated, made certain that they had enough stuff to get by with." (Hearing Tr. 44:18-19.) But if Mr. Dauerman had bothered to investigate his obligations under the Sublease, he would have understood that receiving from HVO "enough stuff to get by with" was not the bargained-for standard imposed under any section of the Sublease and that his obligation was to surrender and deliver up all of the intangible assets, including the existing policies and procedures, back to HG Property. This Event of Default was not cured, and remains uncured.

### ii.    The Shared Drive

In addition, HVO cut off access to the Shared Drive on July 1, 2020. Dauerman admits receiving an email about this. (Plaintiff's Exhibit 3 at p. 1). Dauerman testified as follows about receiving this email:

> Q. [Tom Patton] lists five things. I'd like to focus in on number 3. Number 3 says, "Due to proprietary information, facility personnel access to the common drive, MDS shared drive, DON drive and HR FMLA drive will be disabled on 7-1-20."

Do you see that?
A. I do.
Q. So a couple days before the transition, Mr. Patton was informing Golden Living that access to those four drives would be disabled beginning July 1, right?
A. According to that email, correct.
…
That's what [Tom Patton] wrote and he copied you on it, right?
A. That's correct.
(Hearing Tr. 46:6-16; 70:9-10).

While partial cooperation and access to some documents is always better than no cooperation and no access to any documents, Ms. Seibert testified that HVO's decision to immediately deprive the facilities access to the Shared Drive on July 1 had significant negative consequences:

Q. Did cutting off the shared drive on July 1 compromise patient safety?
A. As a clinical person, yes, I felt it did. During the pandemic, we have to keep in contact with the local health department, make sure we're notifying families and physicians, keep track of where we move people so that we can have COVID units and infection control surveys coming in from the Ohio Department of Health. And not having this stuff readily available was extremely difficult and wasn't, in my opinion, the best for continuity of care.
(Hearing Tr. 128:9-18).

Ms. Seibert's assessment of the "chaotic" transition was a sentiment shared by Mr. Dauerman who also testified about the "chaos" during the transition. (Hearing Tr. 104:16.) Additionally, Joseph Hazelbaker testified that cutting off access to the Shared Drive on July 1 deprived the facilities of the records they needed to accomplish a smooth and uninterrupted transition:

And there were two sources of electronic records that were denied to us. The first we previously discussed were on the shared drive. There were important records on the shared drive. There were wound control records. There were COVID records. There were HR records, BCI log records that I referred to. There were nurse records. There were financial records. All records related to the operation of the facility. Now, some facilities I understand were able to print some documents off, but many facilities were not able to do that. …
So I imagine that some records were copied. But we know that based on the information from the facilities that a lot of records were lost when the shared drive was terminated.
(Hearing Tr. 165:23-166:7; 166:11-13.)

### iii.    PointClickCare

Patient records are specifically mentioned within the definition of Personal Property, but HVO and Peregrine made a decision to deny access to records for patients discharged prior to July 1 in the PointClickCare system. To avoid this problem, all HVO had to do was check the correct box to allow the new operator to access "all resident records within the Facilities." (See Defendant's Ex. 14 at p. 3, item number 5).

Mr. Tim Patton testified on behalf of HVO that the decision to terminate access to these records was an intentional decision that was made by a group of senior executives lead by Mr. Dauerman:

> Q. Did you decide on your own to check that second box, or were you directed to do so?
> A. The management team got together and discussed this information. Mr. Dauerman; head of operations, Renee Hunt; VP of clinical services, Becki Davis; head of HR, Jason Sparks; and the head of our accounts receivable, VP of billing, Kevin Voltz. We discussed the information to transfer over to HG Ohio which was beginning operations on 7-1 of 2020.
> (Hearing Tr. 357:5-12.)

But Mr. Dauerman apparently has no knowledge about this group decision-making regarding these important records, including but not limited to, all patients who had died of COVID-19 prior to the transition date.

> Q. And you still have not, or HVO still has not provided any PCC data or data stored on PCC for pre-July 1 patients, right?
> A. I'm not aware of that. You'll have to ask other people.
> (Hearing Tr. 104:17-20.)

Similarly, Rebecca Davis, Vice President of Quality Assurance/Clinical, testified that she does not have knowledge of this group decision-making process about these patient records:

> Q. Ms. Davis, were you part of the decision-making process with respect to this form?
> A. No.
> Q. You were not?
> A. I was not.

(Hearing Tr. 422:7-11.)

Three senior leadership members of HVO testified and none of them can explain how a decision was made to inhibit the migration of PCC data rather than checking a box that allows for uninterrupted access to all patient records. The PointClickCare transition could have been made seamless, but like with the vehicles and their titles, and the policies and procedures that could have been left at the facilities, HVO made a decision to make the transition needlessly difficult by withholding patient data.

### d. HVO Did Not Cure Its Defaults

In light of the lack of cooperation, Joseph Hazelbaker testified that his repeated attempts at informal resolution of non-compliant default items were met with inaction from HVO, compelling Plaintiffs to pursue their remedies under the Sublease and Pledge Agreement:

> Q. All right. I think you indicated that the discussions with HVO ended sometime at the end of July; is that right?
> A. That's correct.
> Q. What happened next?
> A. Well, based on the complete lack of response, the failure to reply to emails even in a cursory way, I made the decision that the only thing we could do to gain the full cooperation that we needed was to exercise our rights under the pledge agreement.
> (Hearing Tr. 153:8-16).

HG Property followed the procedure set forth in Section 8.1.2 of the Sublease and sent a Notice of Default letter, which included the following event of default:

> Failing and refusing to surrender and deliver up Intangible Assets used in connection with the operation of each of the Facilities, including but not limited to policies and procedures, admissions agreements, trade names, medical records, resident records, employee records, and other documents and records used in normal day to day business operations …
> (JT 15, p.2).

When he received and reviewed the Notice of Default, Dauerman testified that he took no action other than discussing the letter with his lawyers:

Q. Okay. So you received Exhibit J, which is the default letter. And Exhibit J has 25 numbered items on it, right?
A. Correct, yeah.
Q. And your testimony is that excepting any communications with legal counsel, you did nothing to try and investigate or try and understand what the notice of default is claiming?
A. That's correct.
(JT 30, Dauerman Depo. Tr., 203:3-11).

Dauerman made no attempt to investigate or cure the defaults. Instead, without reviewing the Sublease and with full knowledge of the Pledge Agreement, he had his lawyers send a response asking for more details and ignoring clear and curable default items. But Mr. Dauerman already admitted he had no intention of providing the documents because he claimed they were proprietary:

Q. My point is simply this. It doesn't matter what Brian Hazelbaker wanted, or Ralph Hazelbaker wanted, or Wesley Rogers told you, or Eleanor Alvarez told you, or anybody told any of your people. You considered your policies and procedures to be proprietary. You were not leaving them behind, and you affirmatively sent your employee out to gather them up from the facilities. All of what I just said is true, isn't it?

A. That is true. We sent somebody out to pick them up, correct.
(Hearing Tr. 100:13-21.)

In sum, HVO defaulted when it failed to surrender and deliver up the Intangible Assets, including its actions to physically round up and remove policies and procedures utilized by the facilities near the end of the term of the Sublease. HVO additionally defaulted when it denied access to the Shared Drive and the records of former and deceased patients on the PCC system on July 1, 2020. These actions unquestionably violated HVO's obligation to surrender and deliver up the Intangible Property at the end of the Sublease term. When informal resolution failed, formal notice of the Event of Default was provided to and received by Dauerman on behalf of HVO. (Hearing Tr. 57:13-15). Because of his irresponsible conclusion that he was not in default, Dauerman disregarded the Notice of Default and "did nothing to try and investigate or try and understand what the notice of default is claiming." (JT 30, Dauerman Depo. Tr., 203:3-11).

14

With the cure period expired, and still not receiving cooperation or any cure for the defaults, HG Property asserted its rights under the Sublease and the Pledge Agreement, and assigned the membership units of HVO to the newly formed entity, HVO Operations Windup LLC ("Windup"). (Hearing Tr. 153:8-16).

### 2.    HVO's Defaults Have Triggered the Pledge Agreement

Section 22.1 of the Sublease states that HVO will provide collateral "to secure the payment and performance of Tenant's Obligations under this Sublease and related documents and agreements."

It is undisputed that "Tenant's Obligations" are not extinguished on the last day of the lease term. (JT 2, p., 10, Section 1.6 (Definitions): "Tenant's Obligations" means all payment and performance obligations of Tenant Under this Sublease and all other documents relating or pertaining to the transactions contemplated by this Sublease.)

The durability of HVO's obligations, is made perfectly clear by Sublease Section 23.21, "Survival" which reads in relevant part:

> Tenant's representations, warranties, covenants, and agreements in this Sublease shall survive the expiration or termination of this Sublease and, except to the extent made as of the specific date, shall continue in full force and effect until Tenant's Obligations have been performed in full.

At Section 22.1.1, the "Collateral" includes the Pledge Agreement (Exhibit F of the Sublease) which pledges HVO's ownership interests to HG Property. Upon the occurrence of an Event of Default, HG Property may have the Pledged Ownership Interests and Stock registered in its name or the name of its nominee, and shall have the right to exercise all voting rights of the Pledged Ownership Interests and Stock, and shall have all other corporate rights "as if it was the absolute owner thereof." (JT 3, Section 2(c).)

Section 16 of the Pledge Agreement, entitled "Continuing Security Interest," provides that the pledge "shall create a continuing security interest in the Pledged Ownership Interest and Stock

15

and shall (i) remain in full force and effect until the indefeasible payment and satisfaction in full of all Obligations…" "Obligations" is defined to include "'Tenant's Obligations' as defined in the Sublease." (JT 3 at p. 2.).

Defendants ask this Court to ignore Section 16 and instead rely on Section 18 of the Pledge Agreement to reach the conclusion that the Pledge has terminated. That reliance is misplaced for two reasons.

First, Defendants' own conduct reveals they don't believe their own proposed interpretation of Section 18. Section 18 states that upon termination of the Pledge Agreement, the Pledgee shall return the stock certificates "within ten (10) days of the date of written request therefor from Pledgors." At no point has HVO made any such request and despite Defendants' claim that the Pledge is terminated, the record is devoid of any effort by Dauerman or HVO to request the Pledged Ownership Interest and Stock back from HG Property.

Second, Defendants' emphasis of Section 18 (without any regard of Section 16) contradicts the Sixth Circuit's clear instruction that when a contract is unambiguous, courts "should embrace an interpretation that 'promote[s] harmony between . . . provisions.'" *Nature Conservancy, Inc. v. Sims*, 680 F.3d 672, 676 (6th Cir.2012) (quoting *L.K. Comstock & Co. v. Becon Constr. Co.*, 932 F. Supp. 948, 964 (E.D. Ky. 1994)).

In this case, Section 18 provides that "upon termination of the Sublease," at the end of the term or any renewal thereof, "all rights of the Pledgee shall thereupon terminate." Defendants would suggest that the word "termination" must be read narrowly to mean a date no later than the last day of any renewal term – a reading that cannot be harmonized with Section 16 or the survival clause of the Sublease.

Instead, this Court should read Section 18's use of the words "upon termination of the Sublease" to mean upon termination of the Tenant's Obligations under the Sublease, a reading that

marries the extinguishment of the *Pledge Agreement* to the extinguishment of the Tenant's underlying *promises* secured with the pledge (i.e., Tenant's Obligations). This reading is consistent with both the canons of construction and the Sublease's stated purpose for taking collateral in the first place, which is "to secure the payment and performance of Tenant's Obligations under this Sublease and related documents and agreements."

When a default occurs, the acquisition of the pledged stock occurs as a matter of law because it is a matter of contractual interpretation. In *Mongan v. Lykins*, S.D.Ohio No. 1:09-CV-00626, 2010 U.S. Dist. LEXIS 74000, at *10 (July 20, 2010), the pledgor defaulted, the pledgee sued to enforce the pledge agreement, and this Court held that "[a]bsent any evidence to the contrary showing a genuine issue as to any material fact regarding [pledgor's] obligations under the stock pledge agreement or [pledgee's] rights thereunder, the Court concludes that, as a matter of law, [pledgee] is the sole owner of all 211 shares of common voting stock in [the pledgor's company]."

Here, the Pledge Agreement has been triggered by the uncured Events of Default. Section 2(c) of the Pledge Agreement provides that upon the occurrence of an Event of Default the pledgees "shall have the right to exercise . . . all other corporate rights and all . . . other rights, privileges" pertaining to the Pledged Ownership Interests and Stock "as if it were the absolute owner thereof." As a matter of law, the Court should enforce the unambiguous Pledge Agreement and conclude that HVO's membership units have now been acquired by Windup.

### 3. The CARES Act allows HVO to Utilize the Funds at the Facilities

The CARES Act is emergency remedial legislation, passed by Congress to address an unprecedented national crisis. "It is true that the current pandemic is unprecedented, but Congress has taken swift remedial action in passing the Coronavirus Aid, Relief, and Economic Security (CARES) Act, Pub. L. No. 116-136, 134 Stat. 281. […]" *United States v. Valenzuela*, D.N.M. No.

15-CR-01460-WJ, 2020 U.S. Dist. LEXIS 165544, at *6 (Sep. 10, 2020). Remedial laws are construed broadly to effectuate their remedial purpose. *Tcherepnin v. Knight,* 389 U.S. 332, 336, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967) ("[W]e are guided by the familiar canon of statutory construction that remedial legislation should be construed broadly to effectuate its purposes.")

Congress allocated the CARES Funds at issue in this case "to prevent, prepare for, and respond to coronavirus" 116 P.L. 139, 134 Stat. 620.

The CARES Act funds are intended to be utilized by "eligible health care providers … that ***provide diagnoses, testing, or care for individuals with possible or actual cases*** of COVID–19." (*Id.*, emphasis added).

Informal guidance from the Department of Health and Human Services includes some "Frequently Asked Questions" regarding how CARES Act Funds are to be utilized when a change of ownership is underway when CARES Funds arrive. That guidance includes a factual scenario analogous to the facts here. The FAQ states:

"If a seller receives Provider Relief Fund money prior to the completion of a sale, can the seller transfer some or all of the Provider Relief Fund money to the buyer?"

The Answer provided states: "If the transaction is a purchase of the recipient entity (e.g., a purchase of its stock or membership interests), then the Provider Relief Fund recipient may continue to use the funds, regardless of its new owner."

In this case, like in a purchase, Windup has acquired the HVO membership units. In a stock sale, the seller and buyer mutually agree to have the buyer acquire the stock of the seller entity. In this case, HG Property and HVO *mutually agreed* that HVO's membership units would serve as the collateral of the parties' transaction, and would be transferred to a designee of HG Property in the event of an uncured default. Like in a stock sale, HVO's membership units have now been acquired by a new entity, but HVO "may continue to use the funds, regardless of its new owner."

This means that the acquisition of the HVO membership units by HVO Operations Windup, *does not prohibit* HVO from utilizing the CARES Act funds that have been allocated to HVO. Moreover, any potential risk associated with such use would be borne by HVO Windup as the owner of HVO.

The FAQ's are informal agency guidance and do not bind this Court. *See In Home Health, Inc. v. Shalala*, 188 F.3d 1043, 1046 (8th Cir. 1999) ("An agency's interpretive rules, which are not subject to APA rulemaking procedures, are nonbinding and do not have the force of law."); *see also Dyer v. Sec'y of Health & Human Servs.*, 889 F.2d 682, 685 (6th Cir. 1989) ("A policy statement is a pronouncement that simply advises the public what the agency's prospective position on an issue is likely to be."). Notwithstanding that, the above reading of HHS' informal guidance is consistent with the broad remedial purpose of the CARES Act – which is to place these important and urgently needed funds into the hands of nursing homes that can use them to fight infectious disease. A contrary reading of the guidance document would result in a prohibition on placing the CARES Funds into the hands of the entity that is facing the COVID-19 crisis every day. Such a reading is inconsistent with the purpose of remedial legislation. *Herman & Maclean v. Huddleston*, 459 U.S. 375, 386-387, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983) (holding that remedial statutes should be construed "not technically and restrictively, but flexibly to effectuate [their] remedial purposes.").

## C.  Irreparable Injury

Defendants, in their opening statement, argued that "there is no urgency, there is no imminent problem." (Hearing Tr. 21:14.) But Plaintiffs are operating the facilities in the midst of an unprecedented international pandemic in which cases in Ohio are surging to record levels.[2] A

---

[2] Evid.R. 201(b) allows the Court to take judicial notice of a "fact that is not subject to reasonable dispute."

recent article reported in *The Columbus Dispatch*, a copy of which is attached as Plaintiffs' Exhibit 7, finds that "[m]ore Ohioans are currently hospitalized with the virus than at any time since the pandemic began in March."[3]

While the Plaintiffs each day confront the difficulties of protecting a vulnerable elderly population as cases surge, the testimony from Joseph Hazelbaker established that the facilities will utilize the CARES Act funds to "do more" than the facilities' current budgets allow them to do:

> Q. Do the facilities need those CARES funds now?
> A. They needed those CARES funds yesterday. Now, we're doing everything that we can, but we can always do more. Facilities have budgets. There are limitations. We do what we can. We go above and beyond. But these monies were targeted because the government realized that they would be beneficial, and they need to be used for their intended purposes. They allow us to do more.
> (Hearing Tr. 175:3-10).

Mr. Hazelbaker additionally testified as follows, amplifying paragraph 46 of the First Amended Verified Complaint attested to by Brian Hazelbaker (JT 25):

> Q. ... "If plaintiffs are not able to immediately take control of the CARES funds and use them in accordance for their specific purposes, plaintiffs and the patients and employees of the facilities will suffer irreparable harm, and COVID-related operations at the facilities will be severely compromised"?
> Do you see that?
> A. I do.
> Q. Do you agree with that?
> A. I do.
> (Hearing Tr. 190:20-191:4.)

The injunction sought by Plaintiffs will allow them to use the CARES Funds for their specific and urgent intended purpose: go the extra mile to reduce the risk of COVID for patients and employees of their facilities, hopefully averting the risk of irreparable injury that can occur if these funds are not utilized for their intended purpose. By contrast, a denial of the requested injunction allows this risk to go unabated because the funds will not be properly utilized for the

---

[3] Evid.R. 902 provides that "newspapers" are self-authenticating evidence.

protection of patients and employees in the facilities.

### D. Interests of Third Parties

The primary intended beneficiaries of the CARES Act funds are the facilities, which will utilize them to protect their employees and the residents of the facilities. The $1.19 million at issue in this case is earmarked specifically for "Infectious Disease Control." See First Amended Verified Complaint at paragraph 41.

Joseph Hazelbaker testified that the funds will be utilized to protect the interests of these third parties immediately upon receiving access to the CARES Act funds:

> A. If HG, through the acquisition of its stock and the creation of a relationship between it and a subsidiary was to occur, that the funds could be used for the benefit of the operations of the nursing home.
> Q. Can HVO use the funds?
> A. HVO can use the funds, if my reading is correct.
> (Hearing Tr. 306:6-11).

### E. The Public Interest

Finally, "[t]he public interest is served when a court enforces contracts." *Caterpillar Fin. Servs. Corp. v. Smith & Johnson Constr. Co.*, S.D.Ohio No. 2:06-cv-00246, 2006 U.S. Dist. LEXIS 29750, at *4 (May 16, 2006)(Marbley, J) citing *Federal Deposit Insurance Co. v. Aetna Cas. and Sur. Co.*, 903 F.2d 1073, 1078 (6th Cir. 1990). Ultimately, Plaintiffs are seeking enforcement of its contractual remedies that were bargained for under both the Sublease and Pledge Agreement.

Additionally, "the public interest is also served by protecting the health and safety of citizens[.]" *Franklin Jefferson v. City of Columbus*, 211 F.Supp.2d 954, 962 (S.D. Ohio 2002) (Marbley, J.). Here, granting an injunction will allow Plaintiffs to "do more" in their efforts to protect vulnerable Ohio citizens residing and working at the facilities.

## IV. Conclusion

For the reasons stated herein, Plaintiffs respectfully request that the Court grant a preliminary injunction authorizing Plaintiffs to immediately take control of the HVO's bank

accounts for the limited purpose of utilizing the CARES Funds for the benefit of the residents of the facilities.

Respectfully submitted,

/s/ Christopher B. Burch
Gary S. Batke          (0030329)
Christopher B. Burch   (0087852)
Elizabeth E. Cary      (0090241)
BAILEY CAVALIERI LLC
One Columbus
10 West Broad Street, Suite 2100
Columbus, Ohio 43215-3422
Telephone No. (614) 221-3155
Facsimile No. (614) 221-0479
Email: gbatke@baileycav.com
Email: cburch@baileycav.com
Email: ecary@baileycav.com

*Attorneys for Plaintiffs Autumn Court Operating Company LLC, Brookview Operating Company LLC, Columbus Alzheimers Operating Company LLC, Dublin Convalarium Operating Company LLC, Cridersville Skilled Nursing Facility Operating Company LLC, Gardens At Celina Operating Company LLC, Gardens At Paulding Operating Company LLC, Gardens At St Henry Operating Company LLC, Heatherdowns Operating Company LLC, Mccrea Operating Company LLC, And Oak Grove Manor Operating Company LLC*

Rick L. Brunner        (0012998)
Patrick M. Quinn       (0081692)
BRUNNER QUINN
35 N 4th St, Ste 200
Columbus, OH 43215
Telephone No. (614) 241-5550
Facsimile No. (614) 241-5551
Email: rlb@brunnerlaw.com
Email: pmq@brunnerlaw.com

*Attorneys for Plaintiffs Ralph Hazelbaker, HG Property Services Corp. and First Ohio Investors I, LLC*

Andrew Gerling         (0087605)
Doucet Gerling, Co., L.P.A
655 Metro Place South, Suite 600
Dublin, OH 43017
andrew@doucet.law

*Attorneys for Plaintiffs HVO Windup LLC, and Greggory St. Clair*

## CERTIFICATE OF SERVICE

The undersigned certifies that on October 29, 2020, a true and correct copy of the foregoing

was served by the Court's CM/ECF system on all parties of record and served via email to:

Quintin Lindsmith, Esq.
qlindsmith@bricker.com

Ali Haque, Esq.
ahaque@bricker.com

*Counsel for Defendants*

/s/ Christopher B. Burch
Christopher B. Burch