**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| AUTUMN COURT OPERATING COMPANY LLC, *et al.*, | : |
| | : |
| | : **Case No. 2:20-cv-4901** |
| Plaintiffs, | : |
| | : **CHIEF JUDGE ALGENON L. MARBLEY** |
| v. | : |
| | : **Magistrate Judge Vascura** |
| HEALTHCARE VENTURES OF OHIO, *et al.*, | : |
| | : |
| Defendants. | : |

## OPINION & ORDER

### I.     INTRODUCTION

This matter is before the Court on Plaintiffs' Motion for Preliminary Injunction. (ECF No. 21). This Court held a 65.1 Conference on September 22, 2020, and denied Plaintiffs' Motion for a Temporary Restraining Order on September 24. (ECF No. 12). On October 5, 2020, this Court held a Preliminary Injunction hearing, after which the parties filed their post-hearing briefing. (ECF Nos. 34, 35, 38, 39). For the reasons discussed below and based on the arguments of counsel and the evidence presented at the hearing, this Court hereby **DENIES** Plaintiffs' Motion for Preliminary Injunction. (ECF No. 21).

### II.     BACKGROUND

This dispute concerns 1.19 million dollars of funding provided by the U.S. Department of Health and Human Services ("HHS"), as part of the Coronavirus Aid, Relief, and Economic Security Act ("CARES").[1] The CARES Act authorized a monetary distribution to Medicare- and

---

[1] This Court understands from Defendants Healthcare Ventures' status reports that it concluded the process of returning the $1.19 million in CARES Act. Because Defendant has continued to

Medicaid-certified nursing home providers.[2] The payment distribution is targeted at help nursing homes with COVID-19-related expenses for testing, staffing, and personal protective equipment.

Plaintiffs are the operators of eleven skilled nursing Facilities in Ohio, which oversee skilled nursing, assisted living, and long-term care (the "Facilities") and are eligible to receive Medicare funds and the CARES Act Funds.[3] (ECF No. 27 at 24, ¶¶ 12-15). The Facilities are owned by Plaintiff Ralph Hazelbaker, along with his seven adult children and one adult grandchild. The Facilities' parent companies, HG Property Services Corp. ("HG Property") and First Ohio Investors I, LLC ("First Ohio"), are also Plaintiffs in this case. (ECF No. 5 at 2). Plaintiff HG Property formed a new company, Plaintiff HVO Operations Windup, LLC ("HVO Windup"), and adopted resolutions purporting to install HVO Windup as the new manager of Defendant Healthcare Ventures. (ECF No. 25 at 17). HVO Windup is a wholly-owned subsidiary and nominee of HG Property. (*Id.* at 4; ECF No. 21 at 3).[4]

Defendants are Healthcare Ventures of Ohio LLC ("Healthcare Ventures"), its president, Paul M. Dauerman, Health Prime One, Inc. ("Health Prime One"), and NH Management Corporation ("NH Management") (collectively "Healthcare Ventures"). For fifteen years—until

---

receive unsolicited CARES Act Funds, and Plaintiffs continue allegedly to seek possession of the distribution, Plaintiffs' Motion for a Preliminary Injunction is not moot. (ECF No. 45).
[2] Press Release, U.S. Dep't of Health and Hum. Servs, HHS Announces Allocations of CARES Act Provider Relief Fund for Nursing Homes) (Aug. 7, 2020).
[3] The eleven Facilities are as follows: (1) Autumn Court Operating Company LLC; (2) Brookview Operating Company LLC; (3) Columbus Alzheimer's Operating Company LLC; (4) Dublin Convalarium Operating Company LLC; (5) Cridersville Skilled Nursing Facility Operating Company LLC; (6) Gardens at Celina Operating Company LLC; (7) Gardens at Paulding Operating Company LLC; (8) Gardens at St Henry Operating Company LLC; (9) Heatherdowns Operating Company LLC; (10) Mccrea Operating Company LLC; and (11) Oak Grove Manor Operating Company LLC.
[4] Since HG Property owns HVO Windup, this Court will at times refer to HVO Windup and HG Property interchangeably, given that Plaintiffs contend that HG Property HVO Windup owns Healthcare Ventures.

July 1, 2020—Defendant Healthcare Ventures operated the Facilities pursuant to three Subleases entered into with Plaintiff HG Property. (ECF No. 1-1; ECF No. 6; *see infra* Pt. II.B.1.). Defendant Healthcare Ventures has taken the position that, pursuant to the FAQs, it has only two alternatives for dealing with the CARES Act distribution deposited in its First Financial Bank Account: keep the Funds or reject the Funds. (ECF No. 25 at 20).

On August 27, 2020, the federal government sent the 1.19-million-dollar distribution of CARES Act Funds to an operating account at First Financial Bank controlled by the Defendants. (ECF No. 6 at ¶ 12). Plaintiffs contend that they are the proper recipients of this distribution. (*See* ECF No. 21).

## A.  The Three Contracts

In 2005, Defendant Healthcare Ventures became the operator of the eleven Facilities. (ECF No. 25 at 9). Three documents governed the operational relationship between Defendant-Tenant Healthcare Ventures and Plaintiff-Landlord HG Property: (1) the Subleases; (2) the Loan Agreement; and (3) the "Related Agreements." Each of these contracts is summarized below.

### 1.  The Subleases

In 2005, Defendant Healthcare Ventures and Plaintiff HG Property entered into two virtually identical Subleases which governed the terms under which Healthcare Ventures would operate the Nursing Homes (the "Sublease"). (ECF No. 21 at 5; ECF No. 25 at 9). Under the Sublease, Defendant Healthcare Ventures operated the Facilities from June 1, 2005, to July 1, 2020. (ECF No. 21 at 5). The Sublease imposed numerous obligations on Defendant Healthcare Ventures, including the duty to cooperate with Plaintiff HG Property upon the termination of the Sublease. (*Id.* (citing Joint Ex. 3, § 23.23)). It is undisputed that the final term of the Sublease

ended on July 1 and that the Sublease expired. It is also undisputed that even though the Sublease

terminated on July 1, there could be continuing obligations of performance. (ECF No. 25 at 9).

Most importantly, the Sublease contains default provisions. These default provisions are

the heart of the dispute. An Event of Default under the Sublease occurs if Defendant Healthcare

Ventures fails to pay monetary obligations under the Sublease or fails to observe, perform, or

comply with any other material covenant, condition, or agreement under the Sublease. (ECF No.

21 at 5). The cure period lasts for thirty days after receipt of written notice of an Event of Default.

(*Id.*). Thus, certain performance obligations of could survive the termination of the Sublease. (*Id.*).

### 2. The Loan Agreement

A Hazelbaker-owned entity offered a loan to Healthcare Ventures for capital start-up. (ECF

No. 25 at 10). The loan was journalized in the Loan Agreement and Promissory Note (the "Loan

Agreement"). (*Id.*). It is undisputed that the loan was paid off already and that the Loan Agreement

is thus terminated. (*Id.*).

### 3. The "Related Agreements"

At the time the Sublease was entered into, an arrangement was also made where Defendant

Healthcare Ventures would use the accounting services of an entity owned by Plaintiff Hazelbaker,

American Medical Financial Services Corp. ("AMFC"). (*Id.*). AMFC prepared all of Defendant

Healthcare Ventures' financial reports, and Plaintiff Hazelbaker and his entities had access to all

of those records. (*Id.*).

### B. Documents to Secure Defendant Healthcare Ventures' Performance

Defendant Healthcare Ventures was not required to provide a deposit to HG Property. (*Id.*

at 10). As the Landlord, HG Property thus sought two different types of assurances of performance,

memorialized in two agreements: (1) the Pledge Agreement; and (2) the Guaranty. (*Id.*).

### 1. *The Pledge Agreement*

Defendants Dauerman and Healthcare Ventures (the "Pledgors") entered into the Pledge Agreement with Plaintiffs HG Property and First Ohio (the "Pledgees"). (ECF No. 21 at 6). Pursuant to the Pledge Agreement, Defendant Dauerman and his companies granted Plaintiff HG Property a first lien on and security interest in their ownership interests in Defendants Healthcare Ventures' and Dauerman's stock. It specifies that, upon an Event of Default, Plaintiff HG Property may have the pledged ownership interests and stock registered in its name, exercise all voting rights, and all other corporate rights "as if it w[ere] the *absolute owner thereof*." (ECF No. 21 at 6) (emphasis added). An Event of Default under the Pledge Agreement is defined to include "an Event of Default, as such term is defined in the Sublease." (*Id.* (citing Ex. F, Pledge Agreement, § 2(c))).

Two sections of the Pledge Agreement are of particular importance. Section 16, or the Survival Clause, states that the Pledge Agreement creates a continuing security interest in the Pledged Ownership and Stock, which remains in full force until the payment and satisfaction of all of Tenant's obligations. (Joint Ex. 3 at ¶ 16). Section 18, or the Termination Clause, provides that it terminates upon: (1) termination of the Sublease; *and* (2) payment or satisfaction of all Loan Agreement, the Promissory Note, and all other obligations under the Related Agreements. (*Id.* at ¶ 18).

### 2. *The Guaranty*

At the time the Sublease was executed, Defendant Dauerman's two companies—Health Prime One and NH Management—entered into a Guaranty with Plaintiffs HG Property and First Ohio. (ECF No. 21 at 6). Pursuant to the Guaranty, Defendant Dauerman's companies "absolutely, unconditionally, and irrevocably guarantee[d]" to HG Property the prompt payments of rents and

monies due under the Sublease and the full and prompt performance of all other obligations of Defendant Healthcare Ventures under the Sublease. (ECF No. 21 at 6 (citing Joint Ex. 4, Article 1)). If Healthcare Ventures is in default of its obligations under the Sublease, then Plaintiff HG Property is entitled to enforce the Guaranty as well as all rights and remedies available to HG Property under the Pledge Agreement. (*Id.*).

The Guaranty is a "continuing guarantee," which "shall remain in full force and effect . . . after the termination of the Sublease." (ECF No. 25 at 13). This means that even after the Pledge Agreement terminates—*and* if Defendant Healthcare Ventures is in default of its obligations under the Sublease—*then* Plaintiff HG Property is entitled to enforce the Guaranty as well as all rights and remedies available to Plaintiff HG Property under the Pledge Agreement. (*Id.*).

### C. The Transition Period

In November 2019, Defendant, the then-Tenant, Healthcare Ventures gave notice to Plaintiff-Landlord HG Property that the Sublease would not be renewed. (ECF No. 25 at 13). On April 27, 2020, all but one of the Eleven Facilities were incorporated. Also on April 27, Plaintiff HG Property contracted with Golden Living to become the new management company, in advance of Healthcare Ventures' departure. (ECF No. 25 at 16).

On June 30, 2020, Defendants' role as operator of the Facilities terminated upon the expiration of the Sublease. (*Id.*). Plaintiffs via Golden Living became the Facilities' successor operators the following day, on July 1. (ECF No. 5 at 4). Plaintiffs also brought consultant company LeaderStat to facilitate the Transition. The direct participants in the Transition communications on behalf of the owners (i.e., the Plaintiffs) were Eleanor Alvarez of Leaderstat, Roger Wesley of Golden Living, and Larry Weldon of Golden Living. (ECF No. 35 a 30).

### D. The August 3, 2020 Notice of Default

As mentioned above, an Event of Default under the Sublease constitutes an Event of Default under the Pledge Agreement and Guaranty. (ECF No. 21 at 7). On August 3, 2020, Plaintiff HG Property served upon Defendant Healthcare Ventures a "Notice of Default." (Joint Ex. 15). The twenty-five item Notice alleges default under the Sublease. (*Id.*).

### E. The Preliminary Injunction Motion

Now, Plaintiffs' Motion for Preliminary Injunction focuses on the following three items of default: (1) Item One (Failure to Cooperate in the Transition); (2) Item Three (Failure to Surrender Personal Property, i.e., vehicle titles); and (3) Item Four (Failure to Surrender Certain Intangible Assets). (*Id.*).

Plaintiffs aver that Defendant Healthcare Ventures did not cure any of the identified Events of Default, and any contractual right-to-cure period expired on September 2, 2020. (ECF No. 21 at 7). By virtue of these uncured defaults, the Pledge Agreement has not expired, thus triggering Plaintiffs' ownership rights in Healthcare Ventures, pursuant to the Pledge Agreement's Survival Clause. In other words, Plaintiffs argue that Plaintiff HVO Windup now *owns* Defendant Healthcare Ventures and outright is accordingly entitled to access the CARES Funds at First Financial Bank.

Defendants dispute strongly that their corporate identity has been subsumed within HVO Windup. In opposing the requested relief, Defendants state that, under the Pledge Agreement's Termination Clause, the Pledge Agreement terminated when the Sublease expired, i.e., June 30. Defendants contend that the allegations of default are specious, concocted, and without legal or factual bases. Even if the Pledge Agreement remains in force, Defendants aver that Plaintiffs failed

to establish their default arguments and cannot use made-up allegations of contractual default as a pretext to obtain the CARES Act Funds.

These arguments will be reviewed in close detail below.

### III.  STANDARD OF REVIEW

Preliminary Injunctions are extraordinary remedies that should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it. *See Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). Whether to grant such relief is a matter within the discretion of the district court. *NAACP. v. City of Mansfield*, 866 F.2d 162, 166-67 (6th Cir. 1989). Courts consider four factors when determining whether to grant a request for a preliminary injunction: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction. *Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001). "[A] district court is not required to make specific findings concerning each of the four factors used in determining a motion for Preliminary Injunction if fewer factors are dispositive of the issue." *Id.* But a movant must show at least "serious questions going to the merits" to justify this extraordinary remedy be. *Jones v. Caruso,* 569 F.3d 258, 277 (6th Cir. 2009).

### IV.  LAW & ANALYSIS

#### A.  Private Right of Action

Defendant Healthcare Ventures argues that no private right of action allows one party to pursue CARES Act Funds from another party. Healthcare Ventures relies on *Profiles, Inc. v. Bank of America Corp.*, 453 F. Supp. 3d 742 (D. Md. 2020) in arguing the CARES Act does not create

a private right of action. Plaintiffs offer that Defendants' contention is flawed because Plaintiff HVO Windup is not pursuing CARES Act Funds from another private entity but is instead claiming entitlement to the Funds outright, pursuant to the parties' contractual arrangements.

There is no explicit private right of action enumerated in the CARES Act. The Sixth Circuit has observed that "[a]n express federal cause of action states, in so many words, that the law permits a claimant to bring a claim in federal court." *Ohlendorf v. United Food & Commercial Workers Int'l Union, Local 876*, 883 F.3d 636, 640 (6th Cir. 2018) (quoting *Traverse Bay Area Intermediate Sch. Dist. v. Mich. Dep't of Educ.*, 615 F.3d 622, 627 (6th Cir. 2010)).

The question, then, becomes whether the CARES Act creates an implied private right of action. Before implying a private remedy, "we must discern congressional intent[,]" but absent congressional intent, we may not do so, "no matter how desirable it may be." *Estate of Cornell v. Bayview Loan Servicing, LLC*, 908 F.3d 1008, 1013 (2018) (citations omitted). If "Congress wishes to create new rights—even implied rights of action—'it must do so in clear and unambiguous terms.'" *Id.* (quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273, 290 (2002)). To find an implied private right of action, we must "infer that Congress created a private right and provided for a private remedy[.]" *Ohlendorf*, 883 F.3d at 640 (citations omitted). To imply a right of action, Congress's "rights-creating language must be 'clear and unambiguous.'" *Id.* at 641 (quoting *McCready v. White*, 417 F.3d 700, 703 (7th Cir. 2005)). A "statute must specify the right and identify the beneficiary." *Estate of Cornell*, 908 F.3d 1013 (citations omitted). For a statute to create a private right of action, "its text must be 'phrased in terms of the persons benefited.'" *Gonzaga*, 536 U.S. at 2275 (quoting *Cannon v. Univ. of Chi.*, 441 U.S. 677, 688 n.13 (1979)).

In *Profiles*, the plaintiffs of a putative class action sued Bank of America for its refusal to accept their PPP applications. *Id.* at 744. Such refusal was based initially on a Bank of America policy against accepting applications where the applicant lacked a borrowing relationship with the bank. *Id.* at 745-46. That policy was later changed so that those who had only a depository relationship with the bank could apply, but only if they did not have a credit or borrowing relationship with another bank. *Id.* Among other things, the plaintiffs argued there were two primary indicators of Congress's intent to create a private right of action:

> (1) Congress's use of the phrase 'any business concern' in § 1102(a)(1), and (2) Congress's directive that regulations issued by the Secretary of the Treasury 'shall' contain 'terms and conditions that, to the maximum extent practicable, are consistent with' the borrower eligibility criteria, § 1109(d)(2)(B)(i).

*Id.* at 751.

The *Profiles* court disagreed. It noted that the term "any qualified small business concern" was already codified in the Small Business Act ("SBA") prior to the CARES Act, and that courts had concluded the SBA did not contain an implied private right of action. *Id.* It further noted, in support of the view that Congress did not intend to create a separate private right of action in the CARES Act, the civil and criminal regime codified in the SBA. *Id.* ("Pursuant to 15 U.S.C. § 650(c), for example, the Administrator has authority to institute a civil action against lending companies for violations of the SBA."). Ultimately, the court was "not persuaded that the language of the CARES Act evidences the requisite congressional intent to create a private right of action." *Id.* It stated that even assuming PPP applicants had a right under the CARES Act to apply through a lender of their choice, "nothing in its text evidences Congress's intent to enable PPP loan applicants to bring civil suits against PPP lenders, to enforce that right. The plain language of the statute does not suggest an intent to confer the particular right alleged, nor a private remedy against participating SBA lenders." *Id.* at 751-52.

Other courts have since addressed the question of whether the CARES Act creates an implied private right of action. *See, e.g.*, *Johnson v. JPMorgan Chase Bank, N.A.*, 2020 WL 5608683, at *8-9 (S.D.N.Y. Sep. 21, 2020) (finding no private right under CARES Act for agents of lenders seeking agent fees), *appeal filed sub nom. Quinn v. JPMorgan Chase Bank, N.A.*, 20-3588 (2d Cir. Oct. 13, 2020); *Juan Antonio Sanchez, PC v. Bank of South Texas*, 2020 WL 6060868, at *7 (S.D. Tex. Oct. 14, 2020) ("The Court joins the preexisting consensus that 'there is no private cause of action to enforce this [agent fee] provision of the CARES act.'"); *Leigh King Norton & Underwood, LLC v. Regions Fin. Corp.*, 2020 WL 6273739, at *9 (N.D. Ala. Oct. 26, 2020) ("Nothing in the Small Business Act or the CARES Act implies the existence of a remedy for agents denied an agent fee.").

This Court, however, is aware of no decision finding that the CARES Act creates an implied private right of action. This Court concludes that the CARES Act creates no implied private right of action. The text of the CARES Act indicates no intent on the part of Congress to create such a private right of action; it included no clear and unambiguous rights-creating language. Absent congressional intent to create a private remedy, this Court may not imply one.

The inquiry does not end here. While Plaintiffs' original Motion for Preliminary Injunction was based partially on federal-question claims, the Amended Motion focuses almost exclusively on state-law claims. (*Compare* ECF No. 5, *with* ECF No. 21). In the Amended Motion, then, the issues turn on whether the Pledge Agreement remains in effect and, if it does, whether Plaintiff HVO Windup has ownership and control over Defendant Healthcare Ventures. Even if there is no implied private right of action under the CARES Act, this suit can continue because Plaintiffs assert that they are the proper owners of the CARES Act Funds outright. Thus, while this Court reasons that there is no private right of action under the CARES Act, this case for injunctive relief

is based on an interpretation of the governing contracts between the parties. As such, the matter is properly before this Court and may proceed.

### B. Merits Analysis

#### 1. *Likelihood of Success on the Merits*

The first factor this Court must consider is whether Plaintiffs demonstrate a likelihood of success on the merits. To do so, there must be a strong, more-than-a-mere possibility of success. *Posadas-Mejia v. Adducci*, No. 1:20-CV-468, 2020 WL 3469242, at *4 (S.D. Ohio June 25, 2020). In this case, Plaintiffs argue that they are likely to succeed on the merits of the claims they have asserted in their First Amended Verified Complaint, i.e., claims for: (1) a declaration that Plaintiff HVO Windup is the owner of Defendant Healthcare Ventures with authority to transact on Healthcare Ventures' accounts at First Financial Bank; (2) conversion of the CARES Act Funds; (3) unjust enrichment; (4) imposition of a constructive trust; and (5) breach of contract. (ECF Nos. 8, 21). At the heart of these various arguments is Plaintiffs' primary contention that the Pledge Agreement remains in effect due to Defendants' uncured defaults, which triggers Plaintiff HVO Windup's ownership interests.

After careful consideration, this Court finds that the first preliminary-injunction factor weighs against a grant of injunctive relief; Plaintiffs have not shown a likelihood of success on the merits. The groundwork underlying the default allegations is boggy. Shakier still is the assertion that Plaintiff HVO Windup is the new owner of Defendant Healthcare Ventures. Even if lawfully triggered, it is far from obvious to this Court that the Pledge Agreement would permit the Pledgees to keep the financial interests of Healthcare Ventures, given that all performance under the now-expired contracts has been made and material obligations fulfilled.

This Court proceeds as follows. First, it reviews the threshold question of whether the Pledge Agreement has terminated. Second, it conducts a detailed factual review of the hearing testimony and resulting arguments to determine whether Defendants defaulted under the Sublease, such that Plaintiffs can exert ownership of the CARES Act Funds. This latter inquiry mandates a very close and careful look at the three allegations of default, namely: (1) Item One (Failure to Cooperate in the Transition); (2) Item Three (Failure to Surrender Personal Property, i.e., vehicle titles); and (3) Item Four (Failure to Surrender Certain Intangible Assets).

*a.      Has the Pledge Agreement Terminated?*

The threshold question is whether and when the Pledge Agreement terminated. Section 18 of the Pledge Agreement governs the Agreement's termination.[5] It is a two-part, conjunctive clause, providing that the Pledge Agreement terminates upon: (1) termination of the Sublease; *and* (2) payment or satisfaction of the Loan Agreement, the Promissory Note, and all other obligations under the Related Agreements ("The Termination Clause")

---

[5] Section 18 of the Pledge Agreement reads in full:

> Upon Termination of the Sublease at the expiration of the term (or any renewal thereof), and upon payment or satisfaction of all Loan Agreement, the Promissory Note and all other obligations under the Related Agreements, all rights of the Pledgee shall thereupon terminate, and Pledgees shall, in such circumstance, deliver to Pledgors the certificates for the Pledged Ownership Interests and Stock and any stock transfer power(s) within ten (10) days of the date of written request therefor from Pledgors. In such circumstance, if Pledgees do not return such certificates or stock transfer powers after that time period has expired, then such stock certificates and stock transfer powers shall immediately terminate and be null and void without any further action taken by any Pledgor, and each Pledgor shall thereupon have the right to reissue stock certificates for the Pledged Ownership Interests and Stock.

(Joint Ex. 3, ¶ 18).

Plaintiffs argue that the Pledge Agreement has not yet been terminated and that Defendants are in default under the Sublease, generating HG Property's ownership rights in Healthcare Ventures. Defendants retort that the Pledge Agreement terminated when the Sublease terminated, on June 30, 2020, pursuant to the Termination Clause; and even if the Pledge Agreement is lawfully triggered, nothing in the Agreement allows the Pledgees to obtain the stock of Healthcare Ventures after all payments have been made, and all material obligations have been performed. (ECF No. 25 at 11).

Working backward, the second half of the Pledge Agreement's Termination Clause is not in dispute: The Loan Agreement was long ago fulfilled, and Plaintiffs set forth no allegations of continuing obligations under the Promissory Note or the Related Agreements.

As to the first half of the Pledge Agreement's Termination Clause, it is undisputed that the Sublease's *term* terminated on June 30, 2020. But there could theoretically be continuing obligations of performance under the Sublease, indicating that the Pledge Agreement has not terminated. Consequently, to prove that the Pledge Agreement has not terminated, Plaintiffs must demonstrate that there are some unpaid, unsatisfied, or unperformed obligations under the Sublease. They hope to do so with the following four arguments.[6]

First, Plaintiffs argue that Defendants' own conduct demonstrates that the Pledge Agreement has not expired. (ECF No. 34 at 16). Section 18 of the Pledge Agreement provides that upon the Pledge Agreement's termination, the Pledgees shall return the stock certificates within ten days of a written request from the Pledgors. (Joint Ex. 3). Plaintiffs argue that Defendants'

---

[6] Of these, the most important argument is whether there are uncured defaults under the Sublease. This is the subject of this Court's extensive discussion later in this Opinion.

conduct evinces that the Pledge Agreement has not terminated because Defendant Healthcare Ventures has not made any such request.

But this Court construes the cited section differently. Section 18 of the Pledge Agreement says that *once* the Pledge Agreement terminates, *then* the Pledgees shall deliver to the Pledgors the certificates and stock within ten days of a written request from the Pledgors. Plaintiffs prefer the reverse syllogism—that the Pledge Agreement has not terminated *because* Defendant Healthcare Ventures has not requested the Pledged Ownership Interest and Stock back from Plaintiff HG Property. This argument does not succeed.

Second, Plaintiffs asserted previously that the Sublease and Pledge Agreements were "Related Agreements," a term of art in the parties' contractual documents. (ECF No. 26 at 5; *supra* Pt. II.B.3). It appears that Plaintiffs no longer put forth this argument. (*See generally* ECF Nos. 34, 39). At any rate, this Court would reject this argument. The Sublease, Pledge Agreement, and the "Related Agreements" are all separate and distinct contracts. A plain reading of these agreements shows as much. (*See* Joint Exs. 2, 3, 4, 5). Each of these categories of contracts contains separate definitions in the Pledge Agreement. (Joint Ex. 3, §§ D, 1, 2, 4(iv), 18, 19). Therefore, this Court finds that the "Related Agreements" *refer* to the Sublease or the Pledge Agreement but do not include them.

Third, nested in the argument that the Pledge Agreement has not terminated is a question of contractual interpretation. Plaintiffs posit that the Pledge Agreement is unambiguous and that this Court should favor a contractual analysis to promote harmony. (ECF No. 34 at 16 (citing *Nature Conservancy, Inc. v. Sims*, 680 F.3d 672, 676 (6th Cir. 2012))). Sections 16 and 18 of the Pledge Agreement provide the interpretive gloss, now discussed seriatim.

Section 16 of the Pledge Agreement—the Survival Clause—"create[s] a continuing security interest in the Pledged Ownership interests and Stock." (Joint Ex. 3, § 16). This continuing security interest "remain[s] in full force and effect until the . . . satisfaction in full of all Obligations."[7] (Joint Ex. 3, § 16). So, Plaintiffs argue that the Pledge Agreement remains in full force and effect until all obligations are satisfied. (ECF No. 26 at 4-5).

Section 18 of the Pledge Agreement—the Termination Clause—provides that "*upon termination of the Sublease* . . . all rights of the Pledgee shall thereupon terminate." (Joint Ex. 3, § 18) (emphasis added). Defendants read "termination" to mean a date no later than the last day of the Sublease. But Plaintiffs argue that this reading cannot be harmonized with the Survival Clause. (*Id.* at § 16). Instead, Plaintiffs urge this Court to read the Termination Clause's use of the phrase "upon termination of the Sublease" to mean "upon termination of the Tenant's Obligations under the Sublease." (ECF No. 34 at 17). Plaintiffs argue that this reading is consistent with both the canons of construction and the operative documents' underlying purpose to secure payment and performance of the Tenant's obligations. But Plaintiffs' favored interpretation of § 18 of the Pledge Agreement's clause— "Upon termination of the Sublease"—as actually saying "upon termination of the Tenant's Obligations under the Sublease" is unsound at best. Plaintiffs cannot rewrite the Pledge Agreement to insert words they now wish were there. Elsewhere in the bargained-for Pledge Agreement, the parties specified with clarity when one of the operative contracts would continue if there were unsatisfied obligations.

---

[7] "Obligations" is defined in Section 1 of the Pledge Agreement as "'Tenant's Obligations,' as defined in the Sublease." The Sublease defines "Tenant's Obligations" as "all payments and performance obligations of Tenant under this Sublease and all other documents relating or pertaining to the transactions contemplated by this Sublease." (Joint Ex. 2, ¶ 1.) Such Obligations "shall survive the expiration or termination of the Sublease and . . . continue in full force and effect until Tenants Obligations have been performed in full" (*Id.* at ¶ 23.21).

Fourth and finally, the essence of the "has-the-Pledge-Agreement-Terminated" question is whether Defendants defaulted under the Sublease. Plaintiffs' argument can be distilled as follows: An Event of Default under the *Sublease* constitutes an Event of Default under the *Pledge Agreement*; Defendants are in default under the Sublease; so, the Pledge Agreement remains in force given that there are uncured defaults. (ECF No. 21 at 7). Consequently, Plaintiffs contend that with the right-to-cure period expired, Defendants are in default under the Sublease, which triggers the Pledge Agreement's Survival Clause, thereby granting Plaintiffs ownership rights over Healthcare Ventures.

Unquestionably, the instant motion rises and falls with the resolution of this default question. But a full determination on whether the Pledge Agreement has terminated is premature, at least for now. (*See infra* Pt. IV.B.1.b). For the time being, all this Court holds with respect to the Pledge Agreement is: (1) the Pledgee's failure to request the stock certificates does not indicate the Agreement's continuation; (2) the Sublease and Pledge Agreement are not "Related Agreements," as contractually defined in the operative documents; and (3) a plain reading of the Pledge Agreement's Termination Clause clause— "Upon termination of the Sublease" means what it says. This Court waits to decide if there are Events of Default under the Sublease, which indicate Pledge Agreement has terminated until the conclusion of the subsequent subsection.

b.    *Is Defendant Healthcare Ventures in Default?*

On August 3, 2020, Plaintiffs sent Defendant Healthcare Ventures a Notice of Default with twenty-five items, alleging Defendants defaulted under the Sublease. (Joint Ex. 15). Despite receiving the Notice of Default, Plaintiffs argue that Defendant Healthcare Ventures did not cure any of the identified Events of Default, and any contractual right-to-cure period expired on September 2, 2020. (ECF No. 21).

Now, Plaintiffs focus on following three of those twenty-five items of default: (1) Item One (Failure to Cooperate in the Transition); (2) Item Three (Failure to Surrender Personal Property, i.e., vehicle titles); (3) Item Four (Failure to Surrender Certain Intangible Assets). (*Id.*). It is important to have a detailed review of each alleged basis of default. This Court does so below, finding Plaintiffs have not shown a likelihood of success on the merits of whether these allegations suggest uncured defaults under the Sublease. With no remaining factual or legal hook, Plaintiffs have failed to demonstrate a likelihood of success on the merits that the Pledge Agreement remains in effect. They cannot assert ownership over Healthcare Ventures.

### i.    Item One: Failure to Cooperate in the Transition

Item One of the Notice of Default reads as follows:

> Failing and refusing to cooperate with transition of operations and licensing by failing and refusing to deliver contracts, complete and sign documentation, provide complete and immediate access to accounting systems and records, and otherwise provide access to patient, resident and employee records, in violation of Section 15.7 and Section 23.23 of the Subleases.

(Joint Ex. 15).

The Notice of Default's first item of default is bifurcated, alleging curable defaults under both § 15.7 and § 23.23. (Joint Ex. 15). The question reviewed below is whether Defendants defaulted under the Sublease by failing to cooperate in the transition of operations.

### (1)    Section 15.7 of the Sublease

First, § 15.7 of the Sublease provides that upon the termination of the Sublease:

> Tenant shall execute, deliver and file all documents and statements requested by Landlord *to effect the transfer of the affected Facilities' licenses*, Government Authorizations, all reservations or allocation of nursing home beds relating to the Subleased Property . . . and Tenant shall provide to Landlord all information and records required by Landlord *in connection with the transfer of the licenses and Government Authorizations*.

(ECF No. 35 at 45) (emphasis added).

18

The section only mandates the delivery of documents required to effect the transfer of the Facilities' licenses. Without much fanfare, this Court finds that there is no curable event of default under § 15.7 of the Sublease. No evidence presented at the hearing suggested that Defendants failed to execute, deliver, or file any *necessary* information or records by the Landlord needed to effect the transfer of the licenses.[8]

*(2)*    *Section 23.23 of the Sublease*

Second, § 23.23 of the Sublease reads as follows:

> [T]enant shall have the *absolute obligation*, at no expense to Landlord, *to cooperate fully and completely with Landlord* and any subsequent sublease or manager of any of the Facilities in the transition of operations and licensing thereof by providing or allowing *complete and immediate access* to accounting systems and records, contracts, accounts, patient, resident and employee records and other records and information *necessary fo*r *the smooth and uninterrupted transition* of ongoing operations at the Facilities and the uninterrupted continuation of care of all residents and patients located at the Facilities.

(Joint Ex. 2).

The question is whether Defendants are in default of § 23.23 of the Sublease because they did not fulfill their obligation to provide access to all records necessary for a smooth and uninterrupted transition. Much of the testimony at the hearing was devoted to this topic. Below, this Court reviews some of this key testimony and the parties' resulting arguments before turning to resolve this question.

In support of their argument that Defendants defaulted under § 23.23 of the Sublease, Plaintiffs point to the testimony of Amanda Seibert, Joseph Hazelbaker, and Paul Dauerman to

---

[8] The only exception, not relevant to this analysis is the bill of sale. The bill of sale "is a customary document that the outgoing and incoming operators execute as part of the licensing process." (ECF No. 28 at 16). Plaintiffs do not posit any arguments concerning an unprovided bill of sale. (*See generally* ECF No. 21).

demonstrate that Defendants fell short of this absolute obligation to cooperate. (*See generally* ECF No. 34).

Defendants retort that Defendant Dauerman and his staff supported the transition of the employees and patients to the new management company, authorized the turnover of tremendous volumes of data to the new operators, and ensured that all patient records and documentation were accessible at the Facilities such that there would be a smooth continuation of operations and patient care. (ECF No. 35 at 9). As for proof, Defendants discuss the testimony of Rebecca Davis, Timothy Patton, Paul Dauerman, and the deposition of Brian and Joseph Hazelbaker, claiming that under the Sublease, the Tenant's duty to cooperate does not require that every contract, patient record, or employee record be turned over to the Landlord, but only as is "necessary for the smooth and uninterrupted transition of ongoing operations." (*Id.* at 46 (citing the Sublease)).

This testimony is reviewed in turn below, organized according to the witness.

*Amanda Seibert*

Amanda Seibert began working as a nurse at Peregrine Health Services ("Peregrine") in 2009, ultimately becoming the Executive Director of Nursing. She accepted an offer from Golden Living to become its Regional Nurse Consultant. Her first day of work with Golden Living was "Day One" of the new operational ownership, July 1, 2020.

Plaintiffs rely heavily on Ms. Seibert's testimony to prove that Defendant Dauerman and his staff never provided access to important documents and records and, ultimately, failed to ensure a smooth transition as required by § 23.23 of the Sublease. She testified that the transition period was "[c]haotic" since "[a] lot of the facilities didn't have access to the shared drive to get their clinical information they needed, their logs related to COVID, incidents and accidents, some labs." (ECF No. 27, ¶¶ 126:12-22). She further testified that "it obviously was a difficult transition" and

"it seemed very difficult to get things that we could have used at the facilities from Peregrine." (*Id.* at ¶ 128:3-6),

Defendants counter that Ms. Seibert was not involved in Golden Living's preparation for day one of the transition, meaning that she lacked familiarity with what her employer (Golden Living) was doing to ensure that there were policies and procedures in place and that medical records were accessible on day one. (ECF No. 34 at 35). Ms. Seibert further acknowledged that no one had told her that Defendant Healthcare Ventures had printed out all of the logs, including the fall logs, infectious control logs, and COVID-related logs. (*Id.* at ¶¶ 135:22–136:8).

*Joseph Hazelbaker*

Joseph Hazelbaker is the current President of the eleven Facilities. At the hearing, Mr. Hazelbaker testified that Defendant Healthcare Ventures' obligations under § 23.23 "are the strictest standards . . . . It doesn't require partial effort. It doesn't require reasonable effort. It doesn't require best efforts. It provides for the absolute obligation to cooperate fully and completely and provide complete, immediate access for the smooth and uninterrupted operations and continuation of care." (ECF No. 28 at 16-17).

Mr. Hazelbaker further alleged that Defendant Healthcare Ventures defaulted under the section by:

> [P]rovid[ing] partial cooperation, providing documents that were incomplete, providing records that were out of date, [and] impeding access to records. . . . not only did they withhold information, but during a pandemic, Mr. Dauerman sent somebody out to the facilities to take clinical care policies and procedures away from the facilities prior to the term even expiring. These critical care policies and procedures are the Bible of the nurses and staff at the nursing home. So not only was there not full cooperation, there was minimal cooperation and actual impeding of access to these records.

(*Id.* at 18).

Defendants argue that while Mr. Hazelbaker testified on the alleged transition failures of Healthcare Ventures, Mr. Hazelbaker was not involved in the transition and does not have experience in the operation of nursing homes. Defendants point to Mr. Hazelbaker's deposition, where he discussed the factual allegations underpinning the 23.23 default allegation. For example, when asked what he understood to be the undelivered contracts, Mr. Hazelbaker responded: "There are dozens, if not hundreds of contracts that have not been delivered to my understanding. I keep discovering more and more that become relevant to current operations. My understanding [is] that Mr. Dauerman was only willing to provide a list of the contracts rather than the contracts themselves." (Joint Ex. 29).

*Paul Dauerman*

Paul Dauerman, a Defendant in this case, owns two companies—also Defendants, Health Prime One and NH Management. At the hearing, Defendant Dauerman explained his understanding of § 23.23 of the Sublease in the following colloquy:

> Q. And you understand that that was your -- that was one of the obligations that you had upon termination or transfer of operations, right?
>
> A. Correct. I fulfilled all of that.
>
> Q. And you understand that the reason that obligation is placed on the Tenant as the exiting operating is to make sure, most importantly, that the residents and the patients are properly and appropriately cared for, right?
>
> A. Absolutely correct.
>
> Q. And part . . . of the manner and method of making sure the patients and the residents are cared for in an appropriate fashion includes providing all of the records related to those patients and residents to the new operator, correct?
>
> A. That's correct.
>
> Q. And you didn't do that, did you?

A. I did all of that and more. And, as I stated before, you'll have the first group that aborted, the second group that aborted, and a broker who will tell you on top of all of the hundreds and hundreds of emails from various people in my company that provided information . . . Never once was there any complaint that we weren't cooperating except for the Hazelbakers multiple times back in February when they started saying and setting the stage of making a comment about me being hostile and uncooperative. And we have, again, documentation and witnesses from attorneys and others, including the Hazelbaker attorney, in a conference call, who specifically in a call -- I was accused of being hostile and uncooperative by Brian Hazelbaker in a letter. And I asked for clarification of that, and he gave me an example. And so I take a major exception to this because our people worked very hard to provide everything, sometimes instantaneously. And I would say further that cooperation is a two-way street, that there was a requirement for the Landlord to cooperate as well.

Q. You say your people worked very hard to provide information, but they didn't provide information to the common drives, the MDS shared drive, the DON drive, or HR FMLA drive, did they?

A. I'm not going to say that. I think you need to talk to other folks. I cannot say whether they did or not. I don't know on that, what they gave them. We never had any complaints, MDG, or the broker, or Golden Living ever. If they said can you provide something else or we need something, we did it.

(ECF No. 27 at 65).

Defendants emphasize that Mr. Dauerman expressed his willingness to help the Golden Living and LeaderStat personnel with the transition. For example, Mr. Dauerman's directive to his employees who were transitioning to Golden Living was that they had "full access, obviously, to the buildings" and "full cooperation" from Healthcare Ventures. And while the transition might have been chaotic, that did not fall at the hands of the Defendants. Rather, Mr. Dauerman testified that his first meeting with Golden Living was on June 9, 2020, just three weeks before the transition. During that meeting, Mr. Dauerman recalled the Golden Living Chief Executive Officer ("CEO"), Wesley Rogers, and Eleanor Alvarez of LeaderStat told him that they had their own policies and procedures and would not need the outgoing operator's policies and procedures.

Plaintiffs interpret Mr. Dauerman's testimony differently. They contend his testimony demonstrates that Defendants defaulted under § 23.23 of the Sublease because Mr. Dauerman failed to: (1) instruct anyone at Defendant Healthcare Ventures to fulfill the "absolute obligation" to provide "complete and immediate access" to the information contained on the shared drive; or (2) conduct diligence by reviewing the Sublease, which created the transitional problems that § 23.23 is designed to prevent. Plaintiffs also suggest that Ms. Seibert's testimony contradicts Mr. Dauerman's testimony that he was not aware of any efforts to impede the transition efforts, pointing to Ms. Seibert's testimony that she received an email from Mr. Dauerman instructing her not to communicate with Golden Living for employment purposes. (ECF No. 27 at 125, ¶¶ 11-12).

*Rebecca Davis*

Rebecca Davis is the Vice President of Quality Assurance/Clinical for all eleven Facilities. Defendants state further that there is unrebutted testimony that all patient records were left at the Facilities with all employee records. After being asked how patient records are stored, Ms. Davis testified: "So we did a hybrid system of paper and electronic records . . . So really the only clinical data that would have showed up in PointClickCare might have been some nurse's notes and other ancillary notes. But, again, they could have printed those with their read-only access or could request Snapshot to get that backup historical data. . . . [T]he physical chart remained in the [F]acility." (ECF No. 29 at 22).

Plaintiffs retort that Ms. Davis testified that she does not have knowledge of the decision whether to terminate access to resident records.

*Tim Patton*

Tim Patton, the Chief Financial Officer of Healthcare Ventures, testified that AMFC, a Hazelbaker company, "had every single bit of" financial data for the eleven Facilities, with

"complete and full access to" accounts payable invoices, bills, general ledger activity, access to PointClickCare billing information, and census information. (ECF No. 28 at 191).

### Brian Hazelbaker

Brian Hazelbaker, the General Counsel and Vice President of the operating companies, wrote two emails both before and after the Sublease expired on June 30.

First, on May 25, 2020, Mr. Hazelbaker wrote to Jack Butler in relevant part as follows:

> I want to emphasize that we very much appreciate the cooperation that both you and Paul [Dauerman] have shown over the last weeks in dealing with Sale matters . . . Going forward, we look forward to continuing our good relationship. I would say beyond that very constructive and positive relationship we have enjoyed for a long time, and in working with you and Paul [Dauerman] to identify any structuring possibilities that make sense for both parties. In the meantime, the owners/lessors will be moving forward decisively on transition as set forth in the Subleases, and look forward to your complete cooperation in that regard as well, as is clearly required under the Sublease transition provisions.

(Defs.' Ex. 9).

Second, on July 1, 2020, Mr. Hazelbaker wrote Mr. Dauerman:

> We obviously have a much different view of the current situation than you do.
>
> Regardless, the good news is that, we are proceeding a pace with the transition of operations, and reports from Brickyard/GLC [Golden Living] and LeaderStat are that the process had gone well with no significant hitches. The [F]acilities are now effectively transitioned to the new operator, which as you may recall was your ostensible primary concern a few short weeks ago. It has been no easy task, but we have made it happen, at considerable effort and even more considerable expense.

(Defs.' Ex. 19).

Rather than testifying that there were only a handful of unprovided records, Plaintiffs contend that Mr. Brian Hazelbaker testified that he was unsure of the number of missing admission agreements. (Joint Ex. 27 at 203). Even "one missing record is a serious potential problem." (*Id.* at 210).

\* \* \*

Having reviewed this testimony, this Court now resolves whether Defendants defaulted under § 23.23 of the Sublease by failing to provide access to essential documents and records, which were necessary to ensure a smooth transition of operations. This Court finds that Plaintiffs have not demonstrated a likelihood of success on the merits that Defendants defaulted under § 23.23 of the Sublease.

First, the notice of default did not put the recipient on notice of *which* contracts it failed to provide; it only broadly referred to a failure to deliver contracts and records. Plaintiffs themselves seem unsure of which contracts are missing. Mr. Joseph Hazelbaker, President of the operating Facilities, testified that there might have been "dozens" or "hundreds" of missing contracts. (Joint Ex. 29). Together, this indicates that even assuming there are unprovided contracts, they were not necessary to effectuate the transfer of licenses—and, to fall within the ambit of an Event of Default under Sublease, the unprovided contracts must be required.

Second, there was no evidence suggesting that the unprovided records were necessary for the uninterrupted continuation of care for residents and patients. Notably, Mr. Brian Hazelbaker, the General Counsel and Vice President of the operating companies wrote to Mr. Dauerman on July 1, 2020:

> [T]he good news is that, we are proceeding a pace with the transition of operations, and reports from Brickyard/GLC [Golden Living] and LeaderStat are that the process had gone well *with no significant hitches. The facilities are now effectively transitioned to the new operator*, which as you may recall was your ostensible primary concern a few short weeks ago. It has been no easy task, but we have made it happen, at considerable effort and even more considerable expense.

(Defs.' Ex. 19) (emphasis added).

True, Ms. Seibert emphasized that the transition was chaotic. But simply because the transition was less-than seamless does not establish an argument for contractual default. The issue here seems to be more one of dissatisfaction than of default. Borrowing language from the

Bankruptcy Appellate Panel of the Ninth Circuit, this Court finds that the record reflects that the Defendants *did* cooperate, but it was not to Plaintiffs' liking. Accordingly, this Court finds that Defendant Healthcare Ventures did not default based on alleged non-cooperation. *See In re Mensonides Dairy LLC*, No. 2:18-BK-01681-WLH, 2020 WL 7260655, at *6 (B.A.P. 9th Cir. Dec. 10, 2020).

This Court finds that Plaintiffs have not established a likelihood of success on the merits on whether Defendants are in default of § 23.23 of the Sublease. There has not been sufficient testimony establishing that Defendants failed to fulfill their absolute obligation to provide access to all records necessary for a smooth and uninterrupted transition.

### ii. Item Three: Failure to Surrender Personal Property, i.e., Vehicle Titles

Item Three of the Notice of Default reads as follows:

> Failing and refusing to surrender and deliver up Personal Property comprising a part of the Subleased Property, including, but not limited to, all machinery, *vehicles*, equipment, furniture, furnishings, computers, trade fixtures, and Inventory, as required by Sections 1.1 and Section 18.2 of the Subleases, including Tenant's and/or Tenant's affiliates' attempts to and actual absconding with said Personal Property[], and failing and refusing to surrender and deliver up or return same to Landlord upon demand.

(Joint Ex. 15).

Section 18.2 of the Sublease imposes upon Defendant Healthcare Ventures an obligation to "surrender and deliver up the Subleased Property at the expiration or termination of the Term." The "Subleased Property" is defined in Section 1.6 to include both the "Personal Property" and the "Intangible Assets" of the Facilities. (Joint Ex. 2). In turn, the "Personal Property" is defined at § 1.1.5 of the Sublease to include "vehicles." (*Id.*). Plaintiffs maintain that Defendants defaulted by failing to respond to the request for vehicle titles and instead waited until the morning of the Preliminary Injunction hearing to transfer some, but not all, of the vehicle titles. At the hearing,

Mr. Dauerman admitted that he had knowledge that the vehicle titles would need to be transferred but contends that this error was an oversight. Even if it were an oversight, Plaintiffs argue that it still could have been cured within the thirty-day cure period. Defendants retort that the Plaintiffs' position on the vehicle titles fails for the simple reason that it is not mentioned in the Notice of Default.

Even if the Notice of Default referred explicitly to vehicle titles, the Sublease contains a specific provision allowing Healthcare Ventures to retain certain property. Section 7.4 of the Sublease states in relevant part:

> REPLACEMENTS OF FIXTURES AND PERSONAL PROPERTY. Tenants shall not remove Fixtures and Personal Property from the Subleased Property except to replace the Fixtures and Personal Property by other similar items of equal quality and value. Items being replaced by Tenant may be removed and shall become the property of Tenant and items replacing the same shall be and remain the property of Landlord.

(Joint Ex. 3, § 7.4).

Therefore, Healthcare Ventures can retain a vehicle if that vehicle: (1) was replacing an earlier vehicle; or (2) was replaced by a newer vehicle.[9]

With no notice given of the vehicle titles in the Notice of Default, the cure period of thirty days did not start. Default without a notice of an opportunity to cure is not default at all. This Court finds that Plaintiffs have failed to demonstrate a likelihood of success on the merits of whether Defendants defaulted under §§ 1.1 or 18.2 of the Sublease.

### iii. Item Four: Failure to Surrender Certain Intangible Assets

---

[9] No evidence was presented of any repossession of a vehicle.

Item Four[10] in the Notice of Default claims that Defendant Healthcare Ventures defaulted under §§ 1.1.6 and 18.2 of the Sublease by failing to surrender and deliver specific categories of intangible assets, including: (1) policies and procedures; (2) admissions agreements; (3) trade names; (4) medical records; (5) resident records; (6) employee records; and (7) other documents and records used in normal day-to-day business operations.

Sections 1.16[11] and 18.2[12] of the Sublease require turning over only those categories of intangible assets used in the normal, day-to-day business operations.

---

[10] Item Four reads as follows:

> Failing and refusing to surrender and deliver up Intangible Assets used in connection with the operation of each of the Facilities, including but not limited to policies and procedures, admissions agreements, trade names, medical records, resident records, employee records, and other documents and records used in normal day to day business operations, as required by Section 1.1.6 and Section 18.2 of the Subleases, including Tenant's and/or Tenant's affiliates' attempts to and actual absconding with said Intangible Assets, and failing and refusing to surrender and deliver up or return same to Landlord upon demand.

(Joint Ex. 15 ¶ 4).

[11] Section 1.1.6 of the Sublease defines "intangible assets" as follows:

> Any and all intangible assets used in connection with the operation of each of the Facilities, including but not limited to policies and procedures, admissions agreements, trade names, medical records, resident records, employee records, and other documents and records used in normal day-to-day business operations; provided, however, that Tenant shall be obligated for ongoing costs, maintenance or licensing fees, if any, associated with such intangible assets from and after the Commencement Date (collectively, "Intangible Assets").

(Joint Ex. 3, ¶ 1.1.6).

[12] Section 18.2 of the Sublease, sub-titled "Surrender," reads as follows: "Except for (i) Permitted Alterations; (ii) normal and reasonable wear and tear (subject to the obligation of Tenant to maintain the Subleased Property in good order and repair during the Term); and (iii) damage and destruction not required to be repaired by Tenant, Tenant shall surrender and deliver up the Subleased Property at the expiration of the Term in as good order and condition, and with commensurate levels of Inventory, as the Commencement Date." (Joint Ex. 3, ¶ 18.2).

Plaintiffs assert that the following are unprovided intangible assets amounting to default: (1) the policies and procedures used before July 1; (2) the shared drive; and (3) the data and documents on the PointClickCare system pertaining to patients discharged before July 1.[13] Each allegation of default is reviewed in turn below.

### (1) Policies and Procedures

Section 18.2 of the Sublease requires that the Tenant "surrender and deliver up the Sublease Property at the expiration or termination of the Term." (Joint Ex. 2 ¶ 18.2). Included in the definition of "Subleased Property" is intangible property, such as policies and procedures. Plaintiffs argue that Healthcare Ventures defaulted by failing to provide the policies and procedures used prior to the July 1 transition. Defendants, however, introduced unrebutted testimony that the new manager of Golden Living,[14] Wesley Rogers, told Mr. Dauerman and Ms. Davis that the new operators would *not* need the old policies and procedures. (ECF No. 27 at 97). The only policies Plaintiffs sought were the COVID-19-related policies, which were delivered. As such, if turning over the policies and procedures was a contractual requirement, it was waived.

In response to this waiver argument, Plaintiffs reason that whatever Mr. Rogers told Mr. Dauerman and others is irrelevant since Mr. Dauerman never intended to provide the policies and procedures. (ECF No. 34 at 14 ("But Mr. Dauerman already admitted he had no intention of providing the documents because he claimed they were proprietary")). As for proof, Plaintiffs explain that Mr. Dauerman instructed his personnel to visit the Facilities and remove the hard-

---

[13] Plaintiffs do not contend that the other items in this item of default were undelivered. The admissions agreements were at the Facility, and Golden Living used Healthcare Ventures' form of admission agreements. (ECF No. 27 at 83). There was no testimony as to what trade names had not been "surrendered and delivered." (*Id.*).

[14] The Hazelbakers contracted with Golden Living as the new management company.

copy versions of the policies and procedures. Worse still from the Plaintiffs' perspective is that Mr. Dauerman testified that he "didn't look at the sublease." (ECF No. 71 at 91, ¶¶ 1-10). This strengthens the evidence of default since the Sublease imposes an affirmative duty to surrender intangible assets like policies and procedures. Their argument concludes that Healthcare Ventures defaulted under the Sublease since that contract imposes an obligation to provide the successor company any and all policies and procedures.

By way of background, it is useful to review what these policies and procedures covered. The policies and procedures discuss general topics, "things like basic employee policies, when you can take your lunch break, how you go request vacation time, things of that nature." (ECF No. 27 at 49, ¶¶ 1-10). They also included "clinical or nursing staff or clinical and nursing policies." (*Id.*). In other words, the policies and procedures are the "operating guidelines," (ECF No. 29 at 38), which cover "administrative" matters as well as those "that are clinical or medical in nature." (ECF No. 27 at 89, ¶¶ 1-9). Another related sub-category of policies and procedures is the COVID-19 response measures, which Ms. Davis created in March 2020.

Turning to the waiver argument, Defendants contend that Golden Living and its personnel functioned as Plaintiffs' agent, thus binding the principal to the reasonable representations that the agent made. In other words, the question is whether the management company, Golden Living, functioned as Plaintiffs' agent. If yes, did Golden Living's personnel waive any right to the non-COVID-19-related policies and procedure? If no waiver occurred, the remaining question is whether Healthcare Ventures defaulted under the Sublease by failing to provide any and all policies and procedures used before July 1.

The precepts of agency law are familiar and fact-intensive. It is "a well-settled rule that a principal is bound by the acts of an agent acting within actual or apparent scope of the agent's

authority." *Boddie v. Van Steyn*, 2014-Ohio-1069, ¶ 13. "The relationship of principal and agent, and the resultant liability of the principal for the acts of the agent, may be created by the express grant of authority by the principal. Absent express agency, the relation may be one of implied or apparent agency." *Master Consolidated Corp. v. BancOhio Natl. Bank,* 61 Ohio St.3d 570, 574, 575 N.E.2d 817 (1991). Apparent agency exists "where one who is assuming to act as an agent for a party in the making of a contract but in fact has no actual authority to do so, such party will nonetheless be bound by the contract 'if such party has by his words or conduct, reasonably interpreted, caused the other party to the contract to believe that the one assuming to act as agent had the necessary authority to make the contract.'" *Scott*, 2016–Ohio–495, ¶ 13 (quoting *Master Consolidated*, 61 Ohio St.3d at 576, 575 N.E.2d 817).

For a principal to be bound by the acts of its agent under the theory of apparent authority, the evidence must show: (1) the principal held the agent out as possessing sufficient authority to embrace the particular act, or otherwise knowingly permitted the agent as having such authority; and (2) the person dealing with the agent knew of those facts and, acting in good faith, had reason to believe and did believe that the agent possessed the necessary authority. In this case, Defendant must prove that Golden Living personnel had apparent authority to waive any contractual requirement for the outgoing tenant to provide the policies and procedures. Reviewing the underlying record, this Court finds that Defendant demonstrated that Golden Living personnel had apparent authority to bind the principal.

The first prong requires proof that Plaintiffs held Golden Living out as possessing sufficient authority to make decisions during the Transition period. There is evidence in the record the Plaintiffs, operating as the Landlord, held Mr. Rogers out as possessing sufficient authority to act

on the principal's behalf. At the hearing, the President of the operator companies, Joseph Hazelbaker, testified:

> Q.    In fact, I want to be clear. Golden Living, you said, is your agent, right? It's the agent for the operators, right?
>
> A.    That's correct.
>
> Q.    So, if the agent for the operators told Mr. Dauerman two weeks earlier we don't need your past policies and procedures, that would be a statement on behalf of the operators, right, as the agent?
>
> [ . . . ]
>
> Q.    If it said that, yes.

(ECF No. 28 at 95, ¶¶ 4-11).

Even without this probative testimony, it is apparent that Golden Living acted as an agent for the new operating companies. Plaintiffs brought Golden Living[15] in specifically to oversee the transition. This Court finds that Plaintiffs held Mr. Rogers out as possessing sufficient authority to manage and tailor the scope of the transition.

The second prong of the apparent-authority analysis requires proof that Mr. Dauerman and Ms. Davis had reason to believe that Mr. Rogers possessed the authority to bind the Landlord. There is no doubt that Mr. Dauerman and Ms. Davis had a reasonable basis for assuming that Mr. Rogers, as the representative of the incoming operating companies, acted with full authority.

Again, and notably, Defendants introduced unrebutted evidence that Golden Living told Ms. Davis and Mr. Dauerman that it would not need Healthcare Ventures' policies and procedures because they would be bringing their own. This was reflected in Defendants' Exhibit 15, in which Mr. Rogers stated: "[W]e will be moving forward with the policies and procedures that will be

---

[15] The same is true for Leaderstat, the consultant company Plaintiffs hired to facilitate the Transition.

provided to the centers on a thumb drive on day 1." (Defs.' Ex. 15). As Plaintiffs' chosen management company, it was reasonable for Ms. Davis and Mr. Dauerman to rely on these representations. Reliance on an agent's apparent authority means the agent's acts bind the principal. *Chevrolet v. Calhoun*, 10th Dist. Franklin No. 03AP-816, 2004-Ohio-1006, ¶ 13. And parties to an agreement can waive those rights if they so choose. *Glidden Co. v. Lumbermens Mut. Cas. Co.*, 112 Ohio St.3d 470, 861 N.E.2d 109, 2006-Ohio-6553, at ¶ 49 ("Waiver is a voluntary relinquishment of a known right and is generally applicable to all personal rights and privileges, whether contractual, statutory, or constitutional.").

As such, this Court finds that when Mr. Rogers of Golden Living told Mr. Dauerman and Ms. Davis that there was no need to turn over Healthcare Ventures' policies and procedures, it represented a waiver. *Village Leasing, Inc. v. Gil Lieber Oldsmobile, Inc.*, 11th Dist. Ashtabula No. 1151, 1984 WL 6321, *1 ("It is a fundamental rule that a principal is bound by, and liable for, the acts of his agent which the agent does with or within the actual or apparent authority from the principal, and within the scope of his employment") (citing *Weeks v. United States*, 245 U.S. 618 (1918)). As a result, it was reasonable, as a matter of law, for Mr. Dauerman to believe that the statements of personnel at Golden Living were on behalf of their principals. (*Id.* (citing *Chevrolet v. Calhoun*, 10th Dist. Franklin No. 03AP-816, 2004-Ohio-1006, ¶ 13 ("Where third persons rely in good faith on the agent's apparent authority, the principal is bound by the agent's acts falling within the scope of that authority."))). Thus, because parties to a contract can waive those rights if they so choose, this Court finds that Plaintiffs' agent, Golden Living, waived any rights to policies and procedures.

Even if this Court did not find Golden Living acted as Plaintiffs' agent, it is unconvinced that Plaintiffs demonstrated that Healthcare Ventures defaulted under §§ 1.16 or 18.2 of the

Sublease by failing to deliver the no-longer-in-effect policies and procedures. Much of the testimony concerned whether the succeeding operating company would need access to pre-transition policies and procedures in case of a regulatory audit. The oft-given example was if a resident fell, and there was a subsequent investigation into the then-existing policies and procedures to prevent falls. Generally, this Court is skeptical whether the possibility of a regulatory audit at some point in the future requires that the new operating company have access to any and all *prior* and *expired* policies and procedures. (*See* ECF No. 27 at 97, 136-37).

Defendants introduced testimony that it is industry practice for the new operator to institute new policies and procedures, meaning there is no need to have ready access to obsolete policies and procedures. Accordingly, while Mr. Dauerman acknowledges that he instructed an individual called Paul St. John to go to each Facility and remove the boxes containing the pre-July 1 policies and procedures, he contends that the removal of these records was "typical[]" when there is a new operator, because "those records start all new." (ECF No. 27 at 71, ¶¶ 8-10, 48 ¶¶ 7-25). Mr. Dauerman explained, "I've never heard of a new company coming in and wanting our policies and procedures. Most likely, everything is different, from HR, vacations, to clinical. Everything is different." (ECF No. 27 at 91, ¶¶ 10-25; ECF No. 27 at 93; *see also id.* at 97 ("In the normal course of transactions, the exiting operator . . . take[s] those policies and procedures.")). Ms. Davis agreed: "The surveyors don't ask what your policy and procedure was two years ago or seven months ago. They ask for what is your current policy and procedure."

At the hearing, this Court asked Ms. Davis the following hypothetical: if a resident fell in March 2018, and then the operating company enacted changes to prevent future falls in the policies and procedures, upon a September 2019 audit, would the Facility tell the regulators that, "the policy in March was A, but because of the fall, we changed it to B, which is the policy that is in

place now?" (ECF No. 29 at 42). Ms. Davis replied: "No. We would always provide them with the most current copy of the policies and procedures." (*Id.*).

Mr. Joseph Hazelbaker, however, testified contrarily: "The [F]acilities would need the old policies and procedures . . . so that if there is an incident such as a COVID death, everything in place in guiding resident care at the time of that incident is available to the regulators or investigators." (ECF No. 28 at 172 ¶¶ 13-19).

On balance, this Court finds that Ms. Davis' and Mr. Dauerman's testimony establish that there is not an ongoing need for a successor company to have unfettered access to obsolete policies and procedures. While Mr. Hazelbaker's testimony is well taken, it is not enough to rebut other testimony from those involved in the Facilities' day-to-day operations.

Furthermore, this Court is unsure whether Plaintiffs have shown that they, in fact, *sought* the non-COVID-19 policies and procedures.[16] Ms. Davis testified that there was access to the electronic versions of policies and procedures. (ECF No. 29 at 38) (explaining that the successor operator "would not need to have multiple copies"). Further, she testified that if there had been a need for a copy of a particular policy or procedure, she (or others, presumably) "would have asked for it." (ECF No. 29 at 38). If Golden Living needed access to historical records, they could have printed anything from the electronic database called PointClickCare before Healthcare Ventures' account with that company was closed.

This Court finds that Plaintiffs have not demonstrated a likelihood of success on the merits of whether Defendants defaulted under the Sublease in failing to the prior provide the policies and procedures.

---

[16] Ms. Davis delivered to LeaderStat eighteen separate COVID-19 policies and procedures. (ECF No. 29 at 10).

*(2) The Shared Drive and PointClickCare*

Plaintiffs identify two remaining electronic records as bases of default: (1) the shared drive and (2) PointClickCare. PointClickCare is a third-party vendor's electronic data management system used to manage electronic records, including patient data, bills, and general ledger activity. Plaintiffs argue that Healthcare Ventures defaulted when it denied access to the shared drive and the records of former and deceased patients on the PCC system. (ECF No. 34 at 14). An issue Plaintiffs cannot overcome, Defendants contend, is that the Notice of Default does not mention either the shared drive or PointClickCare. Instead, the default letter broadly references admissions agreements, trade names, medical records, *resident records*, employee records, and other documents and records used in normal day-to-day business operations.

Plaintiffs concede that the Notice of Default lacks an explicit reference to the shared drive or PointClickCare. Instead, they posit a syllogism: Section 1.6 of the Sublease defines "Subleased Property" to include "Personal Property" and the "Intangible Assets." In turn, "Intangible Assets" includes "medical records, resident records, [and] employee records." The shared drive and PointClickCare store medical records, resident records, and employee records. Accordingly, the shared drive and PointClickCare fall within the definition of Intangible Assets under the Sublease. This argument is well-taken but inadequate to demonstrate that Defendants are in default for failure to surrender Intangible Assets.

First, given the nature of operations at the Facilities, nearly any document or operating system could be construed as relating to patient records. A real risk in granting the requested injunctive relief, then, is that it would justify an argument of default for nearly any unprovided record. This result would be untenable. And while Plaintiffs argue the need for these Intangible

Assets, the failure to include specific reference to the shared drive and PointClickCare in the Notice of Default makes the extent of that need more doubtful.

Second, the Facilities always had paper files of the same patient data appearing in PointClickCare. (ECF No. 35 at 33). Ms. Davis testified that Golden Living always had "read access" to Healthcare Ventures' PointClickCare data, meaning post-Transition employees retained the ability to view—and print out—the data. So, as a factual matter, Healthcare Ventures did its job in facilitating and providing access to the shared drive and PointClickCare data.

Third, and as mentioned above, the Default Notice mentions neither the shared drive nor PointClickCare. Absent mention in the default letter, no thirty-day cure period began, so no likelihood of success on the merits has been shown on whether Healthcare Ventures defaulted in its ostensible failure to surrender Intangible Assets.

With this, the Court concludes its review of the likelihood of success on the merits portion of the Motion for Preliminary Injunction.

This Court holds that Plaintiffs have not demonstrated a likelihood of success on the merits of the existence of uncured defaults. Plaintiffs have not demonstrated that Defendant Healthcare Ventures defaulted under the Sublease, meaning Plaintiff HG Property's putative property rights under the Pledge Agreement have not been triggered. HG Property cannot exercise any property rights to assert control and ownership of Healthcare Ventures.

Without sufficient evidence that there are uncured defaults, this Court also finds that the Pledge Agreement indeed terminated upon the Sublease's expiration on June 30, 2020. The first factor in the four-factor preliminary injunction test is particularly weighty; this Court now turns to the remaining three queries preliminary-injunction prongs.

## 2. *Irreparability of Harm*

The second factor this Court considers is the irreparability of harm that the Plaintiffs would face absent injunctive relief. Although no single factor is determinative of the availability of a Preliminary Injunction, *In re De Lorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985), a failure to demonstrate the existence of an irreparable injury, absent a preliminary injunction, can be fatal to such a motion. *See, e.g.*, *Southern Milk Sales, Inc., v. Martin,* 924 F.2d 98, 103 (6th Cir. 1991). Additionally, the Sixth Circuit has specified that to demonstrate irreparable harm under the preliminary injunction test, a plaintiff must show that it will suffer "'actual and imminent' harm rather than harm that is speculative or unsubstantiated." *Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006) (quoting *Monsanto Co. v. Manning*, 841 F.2d 1126 (6th Cir. 1998)).

Here, Plaintiffs raise a central harm stemming from their lack of access to the CARES Act Funds, i.e., the need to spend the funding to provide quality care to the patients at the Facilities. This Court turns to the proof presented at the hearing and arguments in the briefing to determine the extent of the feared irreparability. Important here is Mr. Brian Hazelbaker's testimony. The President and General Counsel of the Facilities testified in his deposition that there is no urgent need for the funds and that there is no imminent threat to their ability to provide COVID-related care to the patients:

> Q.     Okay. If [the Eleven Nursing Home Operators] don't have approval from managed care plans, is there another reason why -- could that be another issue with cash flow?
>
> A.     Well, your question seems to continue to confuse this issue of cash flow with the need for the CARES funds. What I seem to pick up from your question is this concept that we don't have enough money to operate the [F]acilities, okay? Fact of the matter is, we're going a great job of operating the [Fa]cilities, okay? We're meeting absolutely all requirements that we have to meet and we're doing a great job of operating and dealing with COVID, okay? But we can do a lot more. So what I understand that you and your client are telling us is that we're not allowed to do more because you're not going to deliver our money to us that we need for the [F]acilities to do even more for our residents and employees.

(Joint Ex. 27 at 63 (B. Hazelbaker Deposition Transcript); *see also id.* at 47-49 (stating that the operating companies have sufficient funds and staffing)).

Plaintiffs, however, argue that Defendants mischaracterize Mr. Hazelbaker's testimony. Amid a pandemic, having enough money to do the minimum does not mean that additional funds are unneeded. (ECF No. 26 at 11). Rather, the receipt and use of the CARES Funds effectuates its intended purpose: to reduce the risk of and prepare for a COVID outbreak at the Facilities. By contrast, a denial of the requested injunction allows this risk to go unabated because the funds will not be used for the intended statutory purpose.

Plaintiffs' assertion that receiving the CARES Act Funds deposited into Defendants' account would provide a financial cushion is understood. But it is axiomatic that a harm is only irreparable where there is no adequate remedy at law. *Sampson v. Murray,* 415 U.S. 61, 90, 94 (1974) ("Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."). Plaintiffs cannot show any imminent irreparable harm since they acknowledge there is an adequate remedy at law in the form of money damages. *See Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992) ("[A] plaintiff's harm is not irreparable if it is fully compensable by money damages."). Thus, this Court finds that Plaintiffs cannot demonstrate sufficient irreparable harm required for injunctive relief.

### 3. The Balance of Equities

The third element requires courts to balance the equities and ask whether issuance of a Preliminary Injunction would serve the interests of third parties. *Easterling v. Rice*, No. 3:15-CV-257, 2015 WL 4917008, at *3–4 (S.D. Ohio Aug. 18, 2015) (internal citations omitted).

Defendants oppose granting injunctive relief, contending it *would* harm Healthcare Ventures *without* conferring a benefit upon the Plaintiffs. Harm would befall Healthcare Ventures because it would be forced to act contrarily to the HHS guidance on the proper use of the distributed funds.

Regulatory guidance on the proper use of the CARES Act Funds is evolving as the pandemic endures.[17] The existing guidance comes from the HHS Frequently Asked Questions ("FAQs") and instructions from the Centers for Medicare and Medicaid. Defendant Healthcare Ventures has taken the position that, pursuant to the FAQs, it has only two alternatives for dealing with the CARES Act distribution deposited in its First Financial Bank Account: keep the Funds or reject the Funds. (ECF No. 25 at 20). Applicability of these FAQs is questionable, Plaintiffs reply because the FAQs only apply to a "change of ownership" scenario; Defendant Healthcare Ventures is not a *previous* owner, and Plaintiff HG Windup is not a *new* owner, and no *transfer* of ownership has occurred. (ECF No. 21 at 8). Rather, Plaintiffs argue that Plaintiff HVO Windup owns Healthcare Ventures outright, by virtue of the ownership interests Windup received under the Pledge Agreement. (*Id.*). More relevant is the Centers for Medicare & Medicaid instruction to feuding parties to "work out between themselves any payment arrangements," such as by an Operations Transfer Agreement. (ECF No. 21 at 9).

Plaintiffs claim that third parties' interests —specifically the 600-plus nursing-home residents at the Facilities—are best served by issuance of the requested injunctive relief. After all,

---

[17] U.S. Dep't of Health and Hum. Servs., Provider Relief Fund General Information (FAQs).

the Facilities' patients are the intended beneficiaries of the CARES Funds—not a prior operator. Any harm that would befall Defendants is speculative and pales compared to the harm to the Facilities' residents. (ECF No. 26 at 12).

Both parties have compelling interests. As the Facilities' operators, Plaintiffs understandably hope to acquire the CARES Act Funds to provide the best patient and resident care possible. On the other hand, Plaintiffs have not shown that there has been a diminution in the quality of care but-for having access to the CARES Funds. Further undermining Plaintiffs' arguments is that there has not been a compelling rejoinder to Defendant Healthcare Ventures' argument that it granting injunctive relief would require Defendants to act contrarily to the HHS guidance.

This Court concludes that the balance of equities favors Defendants. *See Chesapeake & Ohio Ry. Co. v. Harris Stanley Coal & Land Co.*, 56 F. Supp. 849, 852 (E.D. Ky. 1944), *rev'd sub nom. Harris Stanley Coal & Land Co. v. Chesapeake & O. Ry. Co.*, 154 F.2d 450 (6th Cir. 1946) ("[W]hen the issuance of an injunction will cause great injury to defendant, and will confer no benefit or very little benefit in comparison upon complainant, it is proper to refuse the injunction, especially where the right is doubtful, or where money damages will compensate plaintiff, or where the wrong may be otherwise redressed, or where complainant can at comparatively slight cost protect himself.").

### 4. The Public Interest

The fourth and final factor to consider is whether the public interest would be served by granting injunctive relief. Plaintiff emphasizes that the Sixth Circuit recognizes a "significant public interest in the effective administration of Medicare." *Gen. Med. P.C. v. Azar*, 963 F.3d 516, 524 (6th Cir. 2020). Thus, they contend that allowing Defendants to have access to the CARES

Funds conflicts with the public interest. Defendants disagree, stating that the public interest would not be served where Plaintiffs seek to obtain improperly millions of dollars based upon fabricated claims of default. This Court holds as it held under the balance-of-the-equities analysis above—i.e., that the public interest tilts in favor of Defendants given that the basis of the allegations of default is specious and not enough to overcome the HHS Guidance that a recipient of the CARES Act Funds must use it or return it.

In sum, this Court does not find that Plaintiffs have met the four-factor test. The issuance of a Preliminary Injunction finding that Plaintiff HVO Windup owns Defendant Healthcare Ventures by virtue of the Pledge Agreement is unwarranted.

## V.    CONCLUSION

Based on the foregoing reasons, this Court hereby **DENIES** Plaintiffs' Motion for a Preliminary Injunction. (ECF No. 21).

**IT IS SO ORDERED.**

**ALGENON L. MARBLEY**
**CHIEF UNITED STATES DISTRICT JUDGE**

**DATED:  February 1, 2021**