## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF OHIO

AUTUMN COURT OPERATING COMPANY
LLC
1661 OLD HENDERSON ROAD
COLUMBUS, OH 43220

AND

BROOKVIEW OPERATING COMPANY LLC
1661 OLD HENDERSON ROAD
COLUMBUS, OH 43220

AND

COLUMBUS ALZHEIMERS OPERATING
COMPANY LLC
1661 OLD HENDERSON ROAD
COLUMBUS, OH 43220

AND

DUBLIN CONVALARIUM OPERATING
COMPANY LLC
1661 OLD HENDERSON ROAD
COLUMBUS, OH 43220

AND

CRIDERSVILLE SKILLED NURSING FACILITY
OPERATING COMPANY LLC
1661 OLD HENDERSON ROAD
COLUMBUS, OH 43220

AND

GARDENS AT CELINA OPERATING
COMPANY LLC
1661 OLD HENDERSON ROAD
COLUMBUS, OH 43220

AND

GARDENS AT PAULDING OPERATING
COMPANY LLC
1661 OLD HENDERSON ROAD
COLUMBUS, OH 43220

AND

GARDENS AT ST HENRY OPERATING
COMPANY LLC
1661 OLD HENDERSON ROAD

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

**Case No. 2:20-CV-4901**

**Judge Marbley**

**Magistrate Judge Vascura**

**SECOND AMENDED VERIFIED
COMPLAINT FOR EQUITABLE AND
OTHER RELIEF**

COLUMBUS, OH 43220                               :
                                                 :
AND                                              :
                                                 :
                                                 :
HEATHERDOWNS OPERATING COMPANY                   :
LLC                                              :
1661 OLD HENDERSON ROAD                          :
COLUMBUS, OH 43220                               :
                                                 :
AND                                              :
                                                 :
                                                 :
MCCREA OPERATING COMPANY LLC                     :
1661 OLD HENDERSON ROAD                          :
COLUMBUS, OH 43220                               :
                                                 :
AND                                              :
                                                 :
                                                 :
OAK GROVE MANOR OPERATING COMPANY                :
LLC                                              :
1661 OLD HENDERSON ROAD                          :
Columbus, OH 43220                               :
                                                 :
AND                                              :
                                                 :
                                                 :
HG PROPERTY SERVICES CORP.                       :
1661 OLD HENDERSON ROAD                          :
COLUMBUS, OH 43220                               :
                                                 :
AND                                              :
                                                 :
                                                 :
FIRST OHIO INVESTORS I, LLC                      :
1661 OLD HENDERSON ROAD                          :
COLUMBUS, OH 43220                               :
                                                 :
AND                                              :
                                                 :
                                                 :
RALPH HAZELBAKER                                 :
5157 OLENTANGY RIVER ROAD                        :
COLUMBUS, OH 43235                               :
                                                 :
AND                                              :
                                                 :
                                                 :
HVO OPERATIONS WINDUP, LLC                       :
1661 OLD HENDERSON ROAD                          :
COLUMBUS, OH 43220                               :
                                                 :
AND                                              :
                                                 :
                                                 :
GREGGORY ST CLAIR                                :
4109 MAIN STREET                                 :
HILLIARD, OH 43026                               :
                                                 :
        Plaintiffs,                              :
                                                 :
                                                 :
v.                                               :

HEALTHCARE VENTURES OF OHIO LLC    :
C/O SARIS CORP., STAT. AGENT       :
35 N. 4TH STREET        :
COLUMBUS, OH 43215                 :
                                   :
AND                                :
                                   :
PAUL M. DAUERMAN                   :
8800 OLENTANGY RIVER ROAD          :
DELAWARE, OH 43015                 :
                                   :
AND                                :
                                   :
HEALTH PRIME ONE, INC.             :
3500 SNOUFFER ROAD                 :
COLUMBUS, OH 43235                 :
                                   :
AND                                :
                                   :
NH MANAGEMENT CORPORATION          :
3500 SNOUFFER ROAD                 :
COLUMBUS, OH 43235                 :
                                   :
____Defendants.____                :

## FIRST AMENDED VERIFIED COMPLAINT

Now come Plaintiffs, by and through their undersigned counsel, and pursuant to Fed.R.

Civ.R. 15(d), file their Second Amended Verified Complaint against all of the Defendants named

herein.

## INTRODUCTION

1.      This dispute concerns funding provided by the federal government's Coronavirus

Aid, Relief, and Economic Security ("CARES") Act. Two kinds of money were distributed to

HVO. First, HVO received Provider Relief Funds ("PRF Money") which are administered and

delivered directly to the provider by Medicare on or about August 27, 2020. Second, the state of

Ohio was provided with Coronavirus Relief Funds ("CRF Money") and Ohio, through its Office

of Budget and Management ("OBM") distributed approximately $2 million in CRF Money to

HVO.

2.      The PRF Money was sent by the federal government to an operating account at

First Financial Bank controlled by the former operator of the Facilities, Healthcare Ventures of Ohio LLC ("HVO"). At the present time, the accounts of HVO are controlled by Defendant Dauerman.

3.       Without notifying Plaintiffs, HVO applied for CRF Money. The CRF Money was received by HVO and, according to OBM guidance, must be used for costs incurred between March 1, 2020 and December 30, 2020. Plaintiffs, who are eligible to receive that money, subsequently applied to OBM for CRF Money, and OBM notified Plaintiffs that the money had already been released to HVO.

4.       Because they are derived from a difference source, CRF Money is not subject to the same limitations as PRF Money and is not subject to the HHS FAQ's published with respect to the PRF Money which prohibits transfer from one recipient to another.  There is no such prohibition or limitation on transfer as to the Ohio CRF Money

5.       Despite Plaintiffs' demands, Defendants have not turned over any of the PRF Money or any of the CRF Money to Plaintiffs. Defendants' failure to turn over the PRF Money and CRF Money is likely to cause imminent irreparable injury to Plaintiffs, the nearly 600 patients and residents at the Facilities, and the dozens of front-line staff members who work at these Facilities.

6.       Irreparable harm will occur if the PRF Money and CRF Money is not immediately turned over to Plaintiffs so that these funds can be used for ongoing staffing, testing, and other increased and unexpected infectious-disease related costs associated with caring for patients at Plaintiffs' facilities during the national pandemic caused by COVID-19. Additional rounds of CARES funding will meet the same fate without Court intervention.

7.       To avoid irreparable harm to Plaintiffs and to facility residents, which will occur if the funds are not immediately turned over, Plaintiffs are contemporaneously filing a motion for

a temporary restraining order and preliminary and permanent injunction in addition to the relief sought in this Verified Complaint.

8. Additionally, and in the alternative to the relief sought in the portions of this pleading that seek to obtain the funds from Healthcare Ventures of Ohio LLC, Plaintiffs bring several causes of actions, beginning at paragraph 79, against the Defendants relating to Plaintiffs' rights under the contracts, including Plaintiffs' right to take control Defendant HVO by operation of a Pledge Agreement, and various other causes of action.

9. Additionally, the CRF Money is supposed to be utilized for eligible expenses incurred between March 1, 2020 and December 30, 2020 at the Facilities, yet HVO failed to notify Plaintiffs that HVO had applied for and received the CRF Money, constituting separate instances of breach of contract as set forth in the allegations beginning at paragraph 36.

10. Indeed, it is apparent that by failing to disclose either its application for or receipt of the CRF Money , HVO was deliberately attempting to conceal the fact that it had applied for and received the CRF funds, thus preventing the funds from being used for their intended purpose, which was for COVID-related care and expenses at the Facilities.

11. Plaintiffs are entitled to at least their collective pro rata share of the CRF Money, as they have been operating the Facilities since July 1, 2020, that is, for at least 6 out of 10 of the months of the Covered Period (March-December, 2020) for which the CRF Money was issued. And in fact Plaintiffs have sufficient COVID expenses to justify receipt and use of all of the CRF Money, whereas HVO has already been provided over $3.4 million in PRF Money, more than it has in legitimate COVID expenses, and thus cannot utilize or justify any more COVID funds from any source, as demonstrated by HVO's decision to return an additional $1.19 million in PRF funds to the government.

**PARTIES**

12.     AUTUMN COURT OPERATING COMPANY LLC is an Ohio limited liability company that operates a skilled nursing facility located at 1925 East 4th Street, Ottawa, OH 45875.

13.     BROOKVIEW OPERATING COMPANY LLC is an Ohio limited liability company that operates a skilled nursing facility located at 214 Harding Street, Defiance, OH 43512.

14.     COLUMBUS ALZHEIMERS OPERATING COMPANY LLC is an Ohio limited liability company that operates a skilled nursing facility located at 700 Jasonway Ave., Columbus, OH 43214.

15.     DUBLIN CONVALARIUM OPERATING COMPANY LLC is an Ohio limited liability company that operates a skilled nursing facility located at 6430 Post Road, Dublin, OH 43016.

16.     CRIDERSVILLE SKILLED NURSING FACILITY OPERATING COMPANY LLC is an Ohio limited liability company that operates a skilled nursing facility located at 603 E. Main Street, Cridersville, OH 45806.

17.     GARDENS AT CELINA OPERATING COMPANY LLC is an Ohio limited liability company that operates a skilled nursing facility located at 1301 Myers Road, Celina, OH 45822.

18.     GARDENS AT PAULDING OPERATING COMPANY LLC is an Ohio limited liability company that operates a skilled nursing facility located at 199 Route 103, Paulding, OH 45879.

19.     GARDENS AT ST. HENRY OPERATING COMPANY LLC is an Ohio limited liability company that operates a skilled nursing facility located at 522 Western Ave., St. Henry, OH 45883.

20.     HEATHERDOWNS OPERATING COMPANY LLC is an Ohio limited liability company that operates a skilled nursing facility located at 2401 Cass Road, Toledo, OH 43614.

21.     MCCREA OPERATING COMPANY LLC is an Ohio limited liability company that operates a skilled nursing facility located at 2040 McCrea St., Alliance, OH 44601.

22.     OAK GROVE MANOR OPERATING COMPANY LLC is an Ohio limited liability company that operates a skilled nursing facility located at 1670 Crider Rd., Mansfield, OH 44903.

23.     Plaintiffs Autumn Court Operating Company LLC, Brookview Operating Company LLC, Columbus Alzheimers Operating Company LLC, Dublin Convalarium Operating Company LLC, Cridersville Skilled Nursing Facility Operating Company LLC, Gardens At Celina Operating Company LLC, Gardens At Paulding Operating Company LLC, Gardens At St Henry Operating Company LLC, Heatherdowns Operating Company LLC, Mccrea Operating Company LLC, And Oak Grove Manor Operating Company LLC are Ohio limited liability companies (collectively the "Holding Companies") are currently the operators of 11 skilled nursing facilities in the State of Ohio (the "Facilities") all of which Facilities are participants in the Medicare program.

24.     Plaintiff HG Property Services Corp. ("HG Property") is an Ohio corporation that is the parent company of the Holding Companies.

25.     Plaintiff First Ohio Investors I, LLC is an Ohio limited liability company with its principal place of business in Franklin County, Ohio.

26.     Plaintiff HVO Operations Windup LLC is an Ohio limited liability company with its principal place of business in Franklin County, Ohio.

27.     Plaintiff Ralph Hazelbaker is a natural person and a citizen of Ohio and in all circumstances pertinent to this amended complaint acted as the officer, agent and/or authorized

representative of Plaintiff HG Property and/or Plaintiff First Ohio Investors I, LLC.

28.     Plaintiff Greggory St. Clair is a natural person and a citizen of Ohio and in all circumstances pertinent to this amended complaint acted as the officer, agent and/or authorized representative of Plaintiff HVO Operations Windup LLC and/or after September 3, 2020 as an officer of Defendant Healthcare Ventures of Ohio, LLC and its limited liability company manager, Plaintiff HVO Operations Windup LLC

29.     Defendant Healthcare Ventures of Ohio LLC ("HVO") is an Ohio limited liability company which maintains a principal place of business in Franklin County, Ohio.

30.     Upon information and belief, Defendant Paul Dauerman is a natural person and a citizen of the state of Ohio.

31.     Upon information and belief, Defendant Dauerman is an individual who is presently authorized to transact business on HVO's accounts at First Financial Bank.


**JURISDICTION AND VENUE**

32.     The Court has subject matter jurisdiction over this action based on the removal by the Defendants of the Plaintiff's *Verified Complaint* to this Court on the basis of "federal question" jurisdiction, 18 U.S.C. § 1331.

33.     Because this Court is exercising its original jurisdiction, the Court has supplemental jurisdiction pursuant to 18 U.S.C. § 1367(a) over the state-law claims in this action because those claims arise from the same "case and controversy.

34.     This Court has personal jurisdiction over each of the Defendants.

35.     Venue is proper in this Court because the facts that give rise to the causes of action occurred primarily in Franklin County, Ohio which is in the Southern District of Ohio, Eastern Division.

36.     For approximately fifteen years, Defendant HVO operated the Facilities, and in conjunction therewith was authorized to use each Facility's Medicare Provider Agreement and provider number to bill for Medicare services.

37.     HVO opted to terminate its agreements to operate the Facilities, as a group, with a termination date effective June 30, 2020 for all the Facilities. The Plaintiffs thereupon took over operations at the Facilities effective as of July 1, 2020 at 12:01AM.

38.     For Medicare purposes, the rights to use the existing provider agreement and provider number for each facility is transferred from the exiting operator (Defendant HVO) to the new operators (Plaintiffs).  This change of operator is known as a "CHOW." To properly document the CHOW for the eleven Facilities, HVO and Plaintiffs submitted the appropriate Change of Ownership documentation, to the administrative agency for Medicare, the Center for Medicare & Medicaid Services ("CMS").

39.     The change of ownership documentation is known as the Form 855A, which is a lengthy agreement governing the terms and conditions of the change of operators.  True and correct copies of the section of the Form 855A signed by and on behalf of HVO for each of the Facilities are attached hereto as **Exhibit A**.  These signed forms clearly indicate the effective date of transfer, as entered by HVO, as "July 1, 2020" (See page 7 column 2 of each form entitled "Effective Date of Transfer").

40.     The Form 855A's were electronically submitted and signed by the Plaintiffs. copies of the receipt and verification of the submissions for each of the Facilities are attached hereto as **Exhibit B.**

41.     Upon the filing of the Form 855A's, Defendant HVO terminated its right to participate in Medicare for any of the Facilities as of July 1, 2020.  Plaintiffs, in turn, as the

succeeding operators, were automatically assigned the provider agreement and Medicare number for each of the Facilities and, as of that effective date, as the succeeding operators are assigned and entitled to assume all benefits and payments under the provider agreement. **Exhibit C**, *CMS Medicare Financial Management Manual*, Chapter 3, Section 130. However, as the assignee, the new operator may be subject to future deductions, adjustments and liabilities made to that Medicare provider account, even if those liabilities pertain to the prior operator.

42. The approval of the assignment upon filing of the Form 855A's is interim, and requires final review approval by Medicare, a process that can take approximately three to five months. For many of the Facilities, the approval process by Medicare is now complete.

43. During that time, the new operators (Plaintiffs) are entitled to bill Medicare and receive all funds; however, an anomaly of the 855A changeover process is that the funds continue to be sent to the designated EFT bank account of the former operator (here, Defendant HVO) until the final approval is received, at which time all funds commence being paid into the successor operator's bank account.

44. The result of this anomaly is that funds that belong to the successor operator will, for some undetermined period of time, be sent to the former operator's bank account, and it is possible that funds pertaining to periods prior to the transition may be sent to the new operators account after final approval is received. When this occurs, the current and former operators are obligated to remit such funds to the other respective party; improper retention of funds is a violation of Medicare law and regulations.

45. The Facilities operated by Plaintiffs are participants eligible to receive funding under HHS' Provider Relief Fund created by the CARES Act, and more specifically, Plaintiffs are eligible to receive funding from the "Nursing Home Infection Control Distribution" as the current operators of the Facilities. Only the Plaintiffs operate the Facilities and can utilize the

PRF Money.

46. On or about August 27, 2020, the Facilities and Plaintiffs, as the current authorized and named operator for the Facilities, were allocated approximately $1.19 million in funding under the Nursing Home Infection Control Distribution ("PRF Money"). This allocation was based in part on a flat fee to each Facility, plus additional fees calculated on the basis of the number of licensed beds at each Facility. The funds were specifically earmarked to be used for ongoing government-mandated COVID testing for patients, residents and staff at the Facilities, and payments to front line workers engaged in providing COVID services at the Facilities, as well as for purchasing communications devices such as iPads so that family members can communicate with relatives who are residents or patients at the Facilities.

47. Again, as the former operator of the Facilities who has terminated its Medicare eligibility, Defendant HVO does not and cannot meet the eligibility requirements for receipt of the PRF Money, and therefore HVO cannot utilize the PRF Money and has absolutely no legitimate claim to the PRF Money. HVO can utilize only a limited portion of the CRF Money.

48. Because HHS has not yet fully approved the transfer of operations from HVO to Plaintiffs, and Plaintiffs account to receive funds has thus not yet been activated by CMS, the $1.19 million in PRF Money for the Facilities were sent by CMS, on or about August 27, 2020, into the operating account controlled by Defendants at First Financial Bank, specifically, account number ending -0466 ("HVO Account") (although the Defendants, upon information and belief of Plaintiffs, have more than one account at said bank, and the PRF Money may have been transferred to one or more of those additional accounts).

49. In addition, Plaintiffs are aware that HHS has sent additional PRF Money, intended for Plaintiffs, to the HVO Account.

50. Even though Defendants are clearly ineligible to utilize the PRF Money, having

terminated their Medicare participation and in fact cannot as a practical matter use the funds for the specified purposes because it no longer operates the Facilities and has not since June 30, 2020, Defendants have refused Plaintiffs' demands to immediately forward the PRF Money to Plaintiffs.

51. If Plaintiffs are not able to immediately take control of the CRF Money and the PRF Money, and use it in accordance with their intended purposes, Plaintiffs and the patients and employees of the Facilities will suffer irreparable harm and COVID-related operations at the Facilities will be severely compromised.

52. If Plaintiffs are not able to use the CRF Money and the PRF Money for their intended purposes, the Facilities and their residents will be denied the coronavirus relief that is clearly the intention and purpose of the state and federal governments in issuing these funds, frustrating the purpose of the CARES Act law and compromising ongoing testing and care at the Facilities with resultant almost certain irreparable harm during this national pandemic.

53. Defendants HVO and Dauerman have absolutely no legitimate claim to the entire distribution of the CRF Money and PRF Money and they have no way to utilize these funds for the intended purpose, because they are no longer operators of the Facilities or authorized participants in Medicare and have not been for over two months, since June 30, 2020. Moreover, earlier phases of funding from the CARES Act in the amount of approximately $3.4 million were received by HVO prior to June 30, 2020, which is sufficient to cover any and all reimbursable COVID-19 related costs incurred by HVO prior to June 30, 2020.

54. The PRF Money and CRF Money is needed by Plaintiffs on an urgent basis to cover costs associated with time-sensitive operations, including the personnel necessary for increased testing and caring for patients during a national pandemic.

55. Plaintiffs need immediate access to the PRF Money and CRF Money so that

Plaintiffs can spend this emergency funding to protect and care for the patients of the Facilities.

56. Because the PRF Money and the CRF Money are being held in an account controlled by Defendants, Plaintiffs cannot access or utilize the PRF Money or the CRF Money.

57. Plaintiffs have an urgent need to utilize the PRF Money and the CRF Money in accordance with their intended uses, including but not limited to by using the funds to provide additional testing, to use the funds to provide additional staffing, and to provide technology (such as iPads) so that nursing home residents can stay connected to family members without in-person visits that could increase the risk of spreading the coronavirus. The Terms and Conditions pertaining to the PRF Money obtained through the Nursing Home Infection Control Distribution are attached hereto as **Exhibit D.** (The CRF Money is not subject to the Terms and Conditions.)

58. An award of money damages at an uncertain date, months or years in the future, is not an adequate remedy because an award of money damages at some uncertain date in the months or years to come will do nothing to help the Plaintiffs as they operate the Facilities now, during the midst of a national pandemic.

59. Plaintiffs, and the patients served by Plaintiffs, are likely to suffer irreparable harm if Plaintiffs do not immediately receive the PRF Money and the CRF Money, because Defendants' conduct will deprive Plaintiffs of the ability to use the PRF Money and the CRF Money for the very specific purposes designated by the government for the use of these funds, pertaining to costs associated with responding to the COVID-19 national pandemic.

60. Notwithstanding the fact that HVO cannot legally use the PRF Money or the CRF Money because HVO is not operating any of the Facilities, there is imminent risk that HVO could turn over the funds to another account or could improperly divert or dissipate the PRF Money or the CRF Money or return them to the government.

61. Plaintiffs have the ability to monitor the HVO Account and have been made

aware of recent wire transfers initiated by Defendants in an attempt to send funds out of the HVO Account. Defendants have claimed that they have returned some of the PRF Funds to HHS and intend to return some or all of the CRF Money to OBM.

62.     Defendants have created an imminent risk that the CRF Money and the PRF Money could be improperly diverted or dissipated by Defendants or returned to the government.

63.     PRF Money is or was commingled with other funds in the HVO Account.

64.     In the event that the PRF Money is improperly diverted by Defendants, the Terms and Conditions state, "Non-compliance with any Term or Condition is grounds for the Secretary to recoup some or all of the payments made."

65.     Since Plaintiffs are presently operating the Facilities and are approved participants in the Medicare program, it is *Plaintiffs* that could be held liable for repaying HHS or OBM for any improper expenditure of the PRF Money or CRF Money by *Defendants*.

## COUNT I -- CONVERSION

66.     Plaintiffs incorporate by reference each and every one of the previous paragraphs of this complaint as if fully restated herein.

67.     Plaintiffs are the proper owners of the PRF Money and the CRF Money and have an immediate right to possession of the PRF Money and the CRF Money.

68.     Defendants have wrongfully interfered with Plaintiffs' rights to the PRF Money and the CRF Money and instead has or is in the process of converting those funds to its own clearly improper and illegal uses or improperly returning those funds to the government.

69.     Defendants' wrongful conduct has caused damages to be determined at trial.

## COUNT II -- UNJUST ENRICHMENT

70.     Plaintiffs incorporate by reference each and every one of the previous paragraphs of this complaint as if fully restated herein.

71. Defendants have retained money or benefits – the CRF Money and the PRF Money -- which in justice and equity belong to Plaintiffs.

72. The PRF Money were provided by HHS, and the CRF Money was provided by OBM, for reimbursement for eligible costs incurred by Facilities as they continue to face the urgent challenges imposed by the COVID-19 pandemic.

73. Defendants are not entitled to divert or withhold from Plaintiffs the PRF Money that was provided by HHS *after the end of Defendants' term of operations and after the termination of Defendant's participation in the Medicare program* for the Facilities and is to be used strictly and solely for costs and expenses related to operating the Facilities during the COVID-19 national pandemic. Similarly, Defendants are not entitled to divert or withhold from Plaintiffs the CRF money that was provided by OBM.

74. Due to Defendants' conduct, Plaintiffs have suffered injury and seek damages to be determined at trial.

## COUNT III -- IMPOSITION OF CONSTRUCTIVE TRUST

75. Plaintiffs incorporate by reference each and every one of the previous paragraphs of this complaint as if fully restated herein.

76. A constructive trust may be imposed "where it is against the principles of equity that the property be retained by a certain person even though the property was acquired without fraud." *Davis v. Drake*, No. 3:14 CV 113, 2014 U.S. Dist. LEXIS 175259, at *33 (N.D. Ohio Dec. 18, 2014).

77. Defendants have wrongfully obtained, and are wrongfully retaining, the PRF Money that is rightfully the property of Plaintiffs to be used in accordance with the Terms and Conditions attendant thereto. Defendants are additionally wrongfully retaining and withholding from Plaintiffs the CRF Money that is rightfully the property of Plaintiffs to be used in

accordance with OBM Guidelines.

78.     The Court should impose the equitable remedy of a constructive trust as to the PRF Money and the CRF Money to prevent the funds from being dissipated or diverted by Dauerman or returned to the government.

**COUNT IV – DECLARATORY JUDGMENT**

79.     Plaintiffs incorporate by reference each and every one of the previous paragraphs of this complaint as if fully restated herein.

80.     Defendants HVO, Dauerman, Health Prime One, Inc. and NH Management Corp. (together the "Dauerman Defendants") have not complied with their obligations under the complex and interconnected series of documents governing that relationship, and Plaintiffs have responded by exercising their rights and remedies under those documents.

81.     Defendants deny that Plaintiffs are entitled to exercise their contractual rights.

82.     As such, Plaintiffs bring this claim for a declaratory judgment to ascertain the rights and responsibilities of the parties.

83.     In or about June of 2005, HG Property and entities affiliated with it, on the one hand, and Defendant Healthcare Ventures of Ohio, LLC ("HVO") and entities affiliated with it, on the other, commenced an ongoing business relationship involving the lease and operation of twelve skilled nursing homes and assisted living facilities located in Ohio (the "Facilities").

84.     In connection with this relationship, the parties and HVO entered into three related agreements: (i) A series of three subleases, (ii) a stock pledge, and (iii) a guaranty of the stock pledge.

85.     Generally speaking, affiliates of HG Property owned the Facilities and leased the Facilities to HG Property.

86.     In turn, HG Property subleased the Facilities to HVO pursuant to three sublease

agreements effective as of June 1, 2005 (collectively, the "Sublease"). Because the three subleases are in material respects substantially the same, the "Master Sublease Agreement" governing ten of the twelve Facilities is attached hereto as **Exhibit E.**

87.     The terms of the Sublease are complex, but generally provide for HVO to operate the Facilities and to pay rent and comply with other obligations to HG Property.

88.     In or about November of 2019, HVO elected not to renew the Sublease for an additional term, and so notified HG Property.

89.     As such, HVO's operations of the Facilities ceased on or about June 30, 2020.

90.     After HVO's operations ceased on or about June 30, 2020, the Facilities have been operated by affiliates of Plaintiffs and managed by a third-party management company unaffiliated with any of the parties here.

91.     At present, the Facilities are therefore involved in the care and treatment of several hundred elderly or sick patients.

92.     Because the Dauerman Defendants did not have the resources to provide a traditional security deposit of approximately $2 million in connection with a transaction of this size and to guaranty their performance in relation to the Sublease, Plaintiffs on the one hand, and the Dauerman Defendants on the other, entered into a "Stock and Ownership Interests Pledge Agreement" (the "Pledge Agreement"), a true and accurate copy of which is attached hereto as **Exhibit F.**

93.     The Pledge Agreement uses the defined phrase "Pledged Ownership Interests and Stock" to describe, among others (a) 100 shares of common stock of Health Prime, (b) 100 shares of common stock of NH Management, and (c) 100% of the membership interests of HVO. Pledge Agreement at §1. In the Pledge Agreement, the Dauerman Defendants represented and warranted that the Pledged Ownership Interests and Stock were "100% of the presently issued

and outstanding ownership interests or shares of common stock of that respective Pledgor." Pledge Agreement at §6(b).

94.     The interests covered by the Pledge Agreement included 100% of the outstanding interests of Health Prime and NH Management (each of which were owned solely by Mr. Dauerman) and HVO (which was owned in its entirety by Health Prime and NH Management).

95.     In the Pledge Agreement, the Pledgors agreed to "pledge, assign…and deliver[] to the Pledgee the Pledged Ownership Interests and Stock, agrees to pledge all additional shares of capital stock or ownership interest that each Pledgor may hereafter acquire with respect thereto; and grants to the Pledgee a first lien on and security interest in" the Pledged Ownership Interests and Stock." Pledge Agreement at §2(a).

96.     In addition to the making the pledge described above, the Dauerman Defendants agreed to, and in fact did, deliver the certificates for the Pledged Ownership Interests and Stock to the Plaintiffs. True and accurate copies of these certificates are attached hereto as **Exhibit G.**

97.     By its own terms, the Pledge Agreement "create[s] a continuing security interest in the Pledged Ownership Interests and Stock and shall remain in full force and effect until the indefeasible payment and satisfaction in full of all" of HVO's "Tenant's Obligations" under the Sublease and the obligations of Defendant Health Prime and NH Management under the Guaranty. Pledge Agreement, §16.

98.     The Pledge Agreement defines the rights of the Plaintiffs as follows:

99.     Upon the occurrence of an Event of Default…the Pledgees or either of them, at their option, may have any part or all of the Pledged Ownership Interests and Stock registered in their name or that of a nominee…Immediately and without further notice, upon the occurrence of an Event of Default, the Pledgees or either of them, or their nominee, shall have the right to exercise all voting rights as to all or any part of the Pledged Ownership Interests and Stock, all

other corporate rights and all conversion, exchange, subscription or other rights, privileges or options pertaining thereto as if it were the absolute owner thereof…all without liability except to account for property actually received by it…" Pledge Agreement, §2(c).

100.    In the Pledge Agreement, the Dauerman Defendants agreed to "irrevocably constitute and appoint each Pledgee and any officer or agent thereof, with full power of substitution, as its true and lawful attorney-in-fact with irrevocable power and authority in the place and stead of each such Pledgor and in the name of each such Pledgor or in its own name, upon the occurrence of an Event of Default, but solely for the limited purpose of carrying out the actions and to execute any and all documents and instruments which may be necessary or desirable to accomplish" "the power and right, on behalf of each such Pledgor, without notice to or assent by any Pledgor…to take…and transfer or otherwise cancel and reissue the Pledged Ownership Interests and Stock in and to the Pledgees or other party." Pledge Agreement, §5(a), (b). "Thereupon, the Pledgees or such other shareholder(s) shall have all rights as shareholder(s) of Stock as Pledgors as the original holder thereof." Pledge Agreement, §5(b).

101.    Further, in the Pledge Agreement, the Dauerman Defendants agreed that Plaintiffs "shall be accountable only for amounts that it actually receives as a result of the exercise of such powers and neither it nor any of its officers, directors, employees or agents shall be responsible to the Pledgors or any of them for any act or failure to act in any manner whatsoever." Pledge Agreement, §5(d).

102.    The Dauerman Defendants covenanted to Plaintiffs that they would not sell or dispose of any of the Pledged Ownership Interests and Stock, permit any other pledge or lien against any of the Pledged Ownership Interests and Stock, and would not "take any other action which directly or indirectly results in the dilution of the Pledged Ownership Interests and Stock or the creation of additional equity or ownership rights not subject to" the Pledge Agreement.

Pledge Agreement, §7(d).

103.    In addition to the Sublease and the Pledge Agreement, Plaintiffs and the Dauerman Defendants Health Prime and NH Management entered into a Guaranty dated effective as of June 1, 2005. A true and accurate copy of this Guaranty is attached hereto as **Exhibit H** (the "Guaranty").

104.    The Guaranty provides that Defendants Health Prime and NH Management "as primary obligors and not merely as sureties absolutely, unconditionally, and irrevocably guarantee to [HG Property and First Ohio], the full and prompt payment when due…of all rents, additional rents, and other monies due under the Sublease from HVO…and the full and prompt performance of all other obligations of HVO under the Sublease…(collectively, the 'Obligations'), without requiring any notice or proof of nonpayment or nonperformance…" Guaranty, §1.

105.    Under the Guaranty, "if HVO is in default under the Obligations and the default continues to exist after the expiration of all applicable cure periods ('Event of Default') then [Plaintiffs] shall each be entitled to enforce this guaranty against [Defendants Health Prime and NH Management] or any of them, jointly or severally, as well as any and all rights and remedies available to [Plaintiffs], respectively, under" the Pledge Agreement." Guaranty, §2.

106.    The Guaranty provides that it survives "after the termination of the Sublease, until all of the Obligations are paid and performed in full," and does not terminate until "strict and complete fulfillment of the Obligations…" Guaranty, §7.

107.    The Pledge Agreement defines an Event of Default as "the occurrence of any of the following events…(i) the Pledgors or any of them shall default in the observance or performance of any material term, covenant or agreement contained herein; or (ii) an Event of Default, as such term is defined in the Sublease, shall occur and be continuing after the

expiration of all applicable cure periods; or…[HVO] is in default of any material obligation under the Related Agreements, after the expiration of all applicable cure periods."

108.  As such, an uncured Event of Default by HVO under the Sublease also constitutes an Event of Default under the Pledge Agreement.

109.  The Sublease defines an Event of Default as follows:

[HVO] fails to pay in full any install of Rent, or any other monetary obligation payable by [HVO] under this Sublease, within five (5) days after such payment is due…[HVO] fails to observe, perform, or comply with any other material covenant, condition or agreement under this Sublease to be performed by [HVO] and (i) such failure continues for a period of thirty (30) days after written notice thereof is given by [HVO] to [HG Property]

110.  Pursuant to the Pledge Agreement, a "default of any material obligation under the Related Agreements" constitutes an Event of Default under the Pledge Agreement. Pledge Agreement, §4(a)(iv).

111.  The Guaranty and the Sublease constitute Related Agreements under the Pledge Agreement, and so construing the term Related Agreements comports with the intention of all of the parties in entering into the transaction in June, 2005 – to wit, that the Pledge and Guaranty would remain in full force and effect until all of HVO's obligations as tenant under the Sublease were satisfied in full.

112.  At the direction of its prior ownership, HVO committed one or more Events of Default under the Pledge Agreement and/or the Sublease and/or the Guaranty.

113.  By way of example but not limitation, HVO's defaults, occurring during its prior ownership, include:

114.  Failing, as required by sections 6.3, 15.4, and 15.9 of the Sublease, to notify HG

Property of material actions, proceedings, or inquires by any governmental agency, including but not limited to an antitrust and/or price-fixing investigation by the Ohio Attorney General, and a criminal grand jury subpoena.

115. Failing to account for, and to deliver to, HG Property payments received by HVO pursuant to the Coronavirus Aid, Relief, and Economic Security (CARES) Act, as required by §15.4 of the Sublease;

116. Failing, as required by §23.23, to satisfy its "absolute obligation, at no expense to [HG Property], to cooperate fully and completely with [HG Property] and any subsequent sublessee or manager of any of the facilities in the transition of operations and licensing thereof by providing or allowing complete and immediate access to…records and information necessary for the smooth and uninterrupted transition of ongoing operations and the Facilities and the uninterrupted continuation of care of all residents and patients located at the Facilities."

117. Failing to pay, as required by §2.6 of the Sublease, accrued sick leave owed to persons previously employed at the Facilities, obligating Plaintiffs to cover the same, at a cost of $80,000 to $100,000.

118. Failing to pay, as required by §2.6 of the Sublease, employee COVID19 related bonuses and/or salary increases which were promised by HVO to employees of the Facilities;

119. Failing to notify HG Property, as required by §23.23 of the Sublease, of the imminent expiration of employee union contract(s) and/or bargaining agreement(s);

120. Failing to transfer, as required by §§1.1 and 18.2 of the Sublease, the title and/or registration to the multi-passenger transport busses or vans equipped with specialized equipment used for the transport of patients; and

121. Each of the foregoing Events of Default under the Sublease are also Events of Default under §§1 and 2 of the Guaranty and §§2(a), 4(a)(i), and 4(a)(iv) of the Pledge

Agreement.

122.    By letter dated August 3, 2020, HG Property notified HVO of these, and numerous other, Events of Default under the Sublease. A true and accurate copy of this Notice of Default is attached hereto as **Exhibit I.**

123.    Despite receiving the Notice of Default, HVO did not cure any or all of the identified Events of Default. To the extent that any contractual right to a cure period existed, it expired on or about September 2, 2020

124.    Consequently, at the conclusion of the contractual cure period, Plaintiffs exercised their rights to the sublease security under the Pledge Agreement and the Guaranty to transfer the shares, exercise the voting rights of the Pledged Ownership Interests and Stock (i.e., 100% of the equity ownership of Health Prime, NH Management, and HVO), to name Plaintiffs' entity, HVO Operations Windup, LLC ("Operations Windup") as Plaintiffs' nominee, to name Operations Windup as the sole member and manager of HVO, and to vest in Operations Windup all rights of ownership of HVO.

125.    Defendant Dauerman, both directly and through counsel representing him and purporting to represent HVO, has disputed the facts set forth above, including but not limited to (a) that Events of Default under the Sublease and/or the Guaranty and/or the Pledge Agreement occurred, (b) that Plaintiffs are entitled to exercise the rights and remedies outlined in the Pledge Agreement, and (c) that HVO is owned and/or controlled by Operations Windup by virtue of the exercise of those rights.

126.    Defendant Dauerman has improperly characterized the actions of Plaintiffs (including but not limited to the Plaintiffs' presentation to First Financial Bank on or about September 4, 2020 of various documents that support Plaintiffs' interpretation of the parties' contractual covenants) as being unlawful, improper, constituting identity fraud, all of which is

untrue because all of the actions taken by Plaintiffs and Plaintiffs' agents have been remedies that are specifically authorized by the various contractual agreements between the parties and have been made pursuant to the Notice of Default attached as Exhibit I.

127.    On or about September 3, 2020, the Pledgees First Ohio Investors I LLC and HG Property acted pursuant to the Power of Attorney granted to them, a copy of which is attached hereto as **Exhibit J.**

128.    On or about September 3, 2020, utilizing the power of attorney, new officers and a new manager were elected for Defendant Healthcare Ventures of Ohio, LLC, a copy of which is attached hereto as **Exhibit K.**

129.    On or about September 3, 2020 the pledge executed upon the member interest in Healthcare Ventures of Ohio, LLC, the Foreclosure notice for which is attached hereto as **Exhibit L.**

130.    Notice was served upon the pledgors pursuant to the terms of the Sublease Agreement, a copy of which is attached as **Exhibit M.**

131.    On or about September 3, 2020, minutes were adopted by the new member and manager of Defendant Healthcare Ventures Ohio, LLC at copy of which is attached to this email as **Exhibit N.**

132.    Pursuant to the new member minutes (attached hereto as Exhibits K and N) a new statutory agent was adopted for Defendant Healthcare Ventures of Ohio, LLC.

## COUNT V -- BREACH OF CONTRACT

133.    Plaintiffs incorporate by reference each and every one of the previous paragraphs of this complaint as if fully restated herein.

134.    The Dauerman Defendants have breached and continue to breach many of the contractual covenants owed to Plaintiffs, as articulated in the Notices of Default served to the

Dauerman Defendants and attached to this pleading as Exhibit I as well as other defaults.

135.    The Dauerman Defendants' past breaches of the contractual covenants owed to Plaintiffs as articulated in the Notices of Default and other defaults that are continuing, have caused damages to Plaintiffs in an amount to be determined at trial.

## COUNT VI – BREACH OF CONTRACT

136.    Plaintiffs incorporate by reference each and every one of the previous paragraphs of this complaint as if fully restated herein.

137.    In addition to the continuing breaches of the contractual covenants owed to Plaintiffs as articulated in the Notices of Default served to the Dauerman Defendants and attached to this pleading as Exhibit I, and other defaults that may be the subject of additional notices of default, HVO has committed breaches of the Subleases by:

a.    HVO's failure to promptly notify HG Property that HVO received Quality Incentive Payments from HHS for the period during which Plaintiffs were operating the Facilities, as required under the Sublease which requires HVO to tender all material communications to HG Property;

b.    HVO's failure to promptly notify HG Property that HVO had applied for CRF Funds, which are to be used to reimburse for eligible expenses incurred between March 1, 2020 and December 30, 2020, as required under the Sublease which requires HVO to tender all material communications to HG Property;

c.    HVO's failure to promptly notify HG Property that HVO received approximately $2 million in CRF Funds, as required under the Sublease which requires HVO to tender all material communications to HG Property;

d.    HVO's failure to return to HVO the titles of all vehicles, and the titles to at

least three (3) vehicles, that were being utilized by the Facilities at the end of the Subleases, in violation of the Sublease;

e. HVO's failure and refusal to remit to Plaintiffs all or some of the CRF Funds without any justification, as required under the Sublease which requires HVO to provide its full and complete cooperation with respect to the transition of operations of the Facilities;

f. HVO's refusal to tender to HG Property information and documentation with regard to how, and how much, of the CRF Funds HVO has utilized and intends to utilize and is capable of utilizing, including the amount of eligible expenses HVO has incurred between March 1, 2020 and June 30, 2020, thereby making it impossible for Plaintiffs to determine how much of the CRF Funds Plaintiffs may be entitled to utilize for the period of July 1, 2020 to December 30, 2020.

138. Defendants' conduct has resulted in damages to Plaintiffs in an amount to be determined at trial, along with reasonable attorney's fees and costs as allowed under Section 23.20 of the Sublease which provide for the recover of attorney's fees by HG Property against HVO when a default has been declared.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

1. A preliminary injunction, and a permanent injunction that:

a. enjoins Dauerman from transacting on HVO's bank accounts and from utilizing, transferring, diverting or dissipating the CRF Money or the PRF Money, until the Court can adjudicate the merits of Plaintiffs' claim to the ownership of the funds contained in the account; or in the

alternative

   b.  orders First Financial Bank and the Dauerman Defendants to recognize Plaintiff HVO Windup LLC as the party with authority to transact on all accounts HVO accounts at First Financial Bank pursuant to the Stock Pledge and related covenants;

2. Compensatory damages for Defendants' conversion of Plaintiffs' property in an amount to be determined at trial.

3. Legal damages for Defendants' unjust enrichment in an amount to be determined at trial; and

4. Legal damages for Defendants' breach of contract in an amount to be determined at trial; and

5. Imposition of a constructive trust as to the PRF Money and the CRF Money; and

6. Plaintiffs' reasonable attorney's fees and costs as set forth in Section 23.20; and

7. Any further relief the Court finds just.

Respectfully submitted,

*/s/ Christopher B. Burch*

| | |
|---|---|
| Gary S. Batke | (0030329) |
| Christopher B. Burch | (0087852) |

BAILEY CAVALIERI LLC
One Columbus
10 West Broad Street, Suite 2100
Franklin County, Ohio 43215-3422
Telephone No. (614) 221-3155
Facsimile No. (614) 221-0479
Email: gbatke@baileycav.com
Email: cburch@baileycav.com

*Attorneys for Plaintiffs Autumn Court Operating Company LLC, Brookview Operating Company LLC, Columbus Alzheimers Operating Company LLC, Dublin Convalarium Operating Company LLC, Cridersville Skilled Nursing Facility Operating Company LLC, Gardens At Celina Operating Company LLC, Gardens At Paulding Operating Company LLC, Gardens At St Henry Operating Company LLC, Heatherdowns Operating Company LLC, Mccrea Operating Company LLC, And Oak Grove Manor Operating Company LLC*

| | |
|---|---|
| Rick L. Brunner | (0012998) |
| Patrick M. Quinn | (0081692) |

BRUNNER QUINN
35 N 4th St, Ste 200
Columbus, OH 43215
Telephone No. (614) 241-5550
Facsimile No. (614) 241-5551
Email: rlb@brunnerlaw.com
Email: pmq@brunnerlaw.com

*Attorneys for Plaintiffs Ralph Hazelbaker, HG Property Services Corp. and First Ohio Investors I, LLC*

| | |
|---|---|
| Andrew Gerling | (0087605) |

Doucet Gerling, Co., L.P.A
655 Metro Place South, Suite 600
Dublin, OH 43017
andrew@doucet.law

*Attorneys for Plaintiffs HVO Windup LLC, and Greggory St. Clair*

## *VERIFICATION*

I am an authorized representative of Plaintiffs and, under penalty of perjury, the statements in this *Second Amended Verified Complaint* are true and correct based on my own personal knowledge.

Dated this 25 of January, 2021.

*/s/R. Brian Hazelbaker*
R. Brian Hazelbaker CERTIFICATE OF SERVICE

## CERTIFICATE OF SERVICE

The undersigned certifies that on January 25, 2021, a true and correct copy of the foregoing Motion for Leave was served by the Court's CM/ECF system on all parties of record and via email upon the following:

Quintin Lindsmith, Esq.
qlindsmith@bricker.com

Ali Haque, Esq.
ahaque@bricker.com

*Counsel for Defendants*

*/s/ Christopher B. Burch*
Christopher B. Burch

*Attorneys for Plaintiffs Autumn Court Operating Company LLC, Brookview Operating Company LLC, Columbus Alzheimers Operating Company LLC, Dublin Convalarium Operating Company LLC, Cridersville Skilled Nursing Facility Operating Company LLC, Gardens At Celina Operating Company LLC, Gardens At Paulding Operating Company LLC, Gardens At St Henry Operating Company LLC, Heatherdowns Operating Company LLC, Mccrea Operating Company LLC, And Oak Grove Manor Operating Company LLC*